[Crim No. 42521. Second Dist., Div. Seven. July 15, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
LUTHER DICKSON, Defendant and Appellant.

## COUNSEL

Berger, Michelena, Mastroni & Huntoon and Louis H. Berger for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Daniel J. Kremer, Chief Assistant Attorney General, S. Clark Moore, Assistant Attorney General,

Norman H. Sokolow and Howard J. Schwab, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

**JOHNSON, J.**—Luther Dickson appeals from the judgment entered upon his plea of guilty to manufacturing methaqualone for sale (Health & Saf. Code, § 11379). He contends that certain physical evidence should have been suppressed on grounds it was unlawfully discovered and seized at a Los Angeles residence. We find merit in this claim of unlawful search and seizure though for different reasons than asserted in appellant's brief.

### I. STATEMENT OF FACTS AND PROCEEDINGS BELOW

Evidence relating to the search and seizure was taken both at the preliminary hearing and a hearing on a 1538.5 motion. Viewed in accordance with the standard of review of an order denying a suppression motion (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]), the evidence established that at approximately 8 p.m. on October 7, 1980, while Los Angeles Police Officer Michael Pytel was in a patrol car near Figueroa and 65th Streets, he noticed an odor similar to ether. He exited the patrol car and walked toward a house at 6507 South Figueroa, approximately 35 yards from the patrol car. The odor became increasingly strong as he approached the house. Believing that the odor was emanating from a laboratory, he summoned the fire department, police chemists and backup units.

While awaiting their arrival, Pytel walked up an outside stairway to the house and tried to open a wrought iron gate that was five feet in front of the front door. The gate was locked, but the door was open. From outside the gate he saw "bottles, jars, different types of equipment" inside the house. However, Pytel did not testify that these bottles, jars and equipment were of a kind typical or unique to a laboratory. Officer Pytel also heard the sound of a radio or television coming from the house. Officer Pytel then retreated down the outside stairway. He and his partner waited out of sight another 30-45 minutes for the police backup units.

After the backup units and fire truck arrived, Pytel and several other uniformed officers climbed the stairs to the house with their guns drawn and carrying a crowbar borrowed from a neighbor in case they had to force the iron gate. Appellant came out to the gate and looked toward the officers.

Pytel immediately identified himself as an officer and told appellant to unlock the gate. Appellant did so.

Officer Pytel and other officers then entered the house. Pytel noted the same ether odor was even stronger inside. He also saw paraphernalia and chemicals similar to those he had seen previously in illicit narcotic laboratories.[1] The officers found no one else inside the house. Officer Pytel thereupon arrested appellant for manufacturing illicit narcotics.

Los Angeles police criminalist Michele Hawkins testified that when she arrived at the house soon after Pytel's summons, she detected a high concentration of organic compounds in the air. Appellant complained of heart problems and was taken to a medical facility. He was not found to be suffering the symptoms of anesthesia or narcosis.

Five witnesses called by appellant testified there was no chemical odor in the air in the vicinity of the house. They further testified that police officers made no attempt to evacuate them from their houses or to warn them an explosion or fire might occur. In addition, a safety engineer testified a strong odor of ether could be detected 35 yards from its source. In that event, however, the concentration at the source would be enough to cause anesthesia or narcosis. Furthermore, at that concentration it would be imprudent for a person who believed there was imminent danger of explosion to make entry with a drawn revolver.

Appellant's attack on credibility of the witnesses is of no avail since that was a matter for the trial court, which resolved the issue in favor of the People's witnesses. (*People* v. *Leyba, supra,* 29 Cal.3d 591; *People* v. *Reyes* (1974) 12 Cal.3d 486 [116 Cal.Rptr. 217, 526 P.2d 225]; *People* v. *Kunkin* (1973) 9 Cal.3d 245 [107 Cal.Rptr. 184, 507 P.2d 1392, 57 A.L.R.3d 1199]; *People* v. *Newland* (1940) 15 Cal.2d 678 [104 P.2d 778].) However, accepting officer Pytel's testimony as true, substantial questions remain as to the validity of this search and thus the admissibility of the evidence discovered and seized at the residence.

## II. The Relationship Between Probable Cause and "Exigent Circumstances"

■ At the threshold, we note this arrest and search cannot be justified on grounds appellant consented to the officers' entry into his home. A "re-

---

[1] Pytel testified that he had seen illicit narcotic laboratories on three previous occasions, including an occasion where the laboratory had exploded when police officers and firemen were nearby.

quest" from a half dozen uniformed police officers moving up one's stairs with pistols drawn hardly invites the expression of free will. Yielding to that "request" cannot qualify as consent within the meaning of the consensual search exception to the Fourth Amendment. (*People* v. *McKelvy* (1972) 23 Cal.App.3d 1027 [100 Cal.Rptr. 661]; *Stern* v. *Superior Court* (1971) 18 Cal.App.3d 26 [95 Cal.Rptr. 541]; *United States* v. *Jones* (6th Cir. 1981) 641 F.2d 425; *United States* v. *Marshall* (9th Cir. 1973) 488 F.2d 1169; LaFave, Search and Seizure (1978) § 8.2(b), pp. 642-643.) Accordingly, the officers' initial entry into appellant's home must be justified on grounds they were entitled to intrude into appellant's home without his consent.

The officers did not enter appellant's home to execute a search warrant nor an arrest warrant. Indeed they had not attempted to obtain either. Rather they seek to justify the initial intrusion into a dwelling and the ensuing arrest and search under the rubric of "exigent circumstances."

There appears to be some confusion in the record below about how "exigent circumstances" were being used to justify the officers' actions.

Our review of the authorities indicates "exigent circumstances" have excused compliance with three very different and distinct search and seizure requirements related to dwellings.[2] ▮ First, when officers have obtained a *valid search or arrest warrant,* "exigent circumstances" may allow them to dispense with the ordinary "knock and notice" requirements in entering a premises to execute that warrant. (*People* v. *Gastelo* (1967) 67 Cal.2d 586 [63 Cal.Rptr. 10, 432 P.2d 706] [exigency may be potential destruction of evidence if notice given]; *People* v. *Dumas* (1973) 9 Cal.3d 871 [109 Cal.Rptr. 304, 512 P.2d 1208] [exigency may be potential danger to persons if notice given]; *People* v. *Fernandez* (1967) 255 Cal.App.2d 842 [63 Cal.Rptr. 778]; *People* v. *Henderson* (1976) 58 Cal.App.3d 349 [129 Cal.Rptr. 844]; LaFave, Search and Seizure, *supra,* §§ 4.8(d), (e), pp. 131-137; Witkin, Cal., Evidence (2d ed.) 1977 Supp., § 136B, pp. 282-284.) ▮ Secondly, when officers have *valid probable cause* to believe a certain suspect has committed an offense "exigent circumstances" may excuse them from obtaining a warrant before entering the premises to arrest that person.[3] (*People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629,

---

[2]The "exigent circumstances" rubric likewise has been used on occasion to explain why search warrants are not necessarily required for searches of automobiles and other movable premises. This meaning of exigent circumstances is not applicable to a residence or any other fixed structure.

[3]"Exigent circumstances" likewise may allow the officer to enter without complying with the "knock and notice" requirements ordinarily mandated for warrantless arrests and searches under Penal Code section 844. However, that is essentially the same application of "exigent circumstances" as dispensing with "knock and notice" when serving a warrant.

545 P.2d 1333]; *Payton* v. *New York* (1980) 445 U.S. 573 [63 L.Ed.2d 639, 100 S.Ct. 1371]; Donnino and Girese, *Exigent Circumstances for a Warrantless Home Arrest* (1980) 45 Albany L.Rev. 90.) ■ Finally, when officers *lack sufficient probable cause* to believe a certain suspect has committed an offense or that a given premises houses criminal activity or evidence, "exigent circumstances" sometimes can function as a *substitute for probable cause* to legitimate a forced entry into a house or other premises. (*People* v. *Roberts* (1956) 47 Cal.2d 374 [303 P.2d 721]; LaFave, Search and Seizure, *supra,* § 6.5(d), pp. 455-458.)

The first two applications of "exigent circumstances" presuppose probable cause either to arrest or to search. Without that probable cause it is irrelevant whether the officers can be excused from obtaining a warrant or complying with ordinary "knock and notice" requirements, the search still fails. The third application, on the other hand, validates an entry and incidental search even though the officers did not possess sufficient proof of criminal activity to qualify as probable cause for an arrest or search. However, when probable cause is lacking only one species of "exigent circumstances" ordinarily will suffice: the unconsented to entry must be necessary to prevent serious and imminent peril to life, health or property. (*People* v. *Roberts, supra,* 47 Cal.2d 374; Model Code of Pre-Arraignment Procedure, Proposed Official Draft, 1975, § 260.5.)

It is not altogether clear which one, or more, of these three distinct applications of "exigent circumstances" was used by the trial court to sustain the search in this case. Accordingly, we scrutinize the propriety of the officers' entry under all three.

### III. The Officers Lacked Probable Cause for a Warrantless Search

■ Since probable cause is a prerequisite to the relevance of the first two applications, we begin with the question of whether the officers had probable cause for an arrest or search before entering appellant's property. At that time, they had two pieces of evidence which *might* be deemed to bear on probable cause—a strong odor of ether emanating from the premises and Officer Pytel's observations of "bottles, jars, and other equipment" inside the home. However, on closer examination, Officer Pytel's visual observations from appellant's front stairs appear irrelevant to the probable cause issue.

In neither his preliminary hearing nor his 1538.5 hearing testimony did Officer Pytel characterize these bottles, jars or other equipment as unique— or even typical—of a narcotics laboratory. Nor did he indicate that his prior

training or experience in narcotics investigations suggested the "bottles, jars and other equipment" were paraphernalia of a lab. He also did not describe these articles in any way so that the trial court could have reasonably drawn the conclusion they were associated with the manufacture of methaqualone or other narcotics. Indeed from the generalized description elicited from Officer Pytel these "bottles, jars and other equipment" may well have been more consistent with some legitimate purpose such as cooking food than they were with manufacturing illicit drugs. Hence this court finds probable cause must rest on a single item of evidence, a strong odor of ether detectable some 35 yards from the source.

Our research has not yielded any decision holding the odor of ether sufficient, in and of itself, to establish probable cause to believe a narcotics laboratory or other criminal activity is underway in a dwelling or other building. On the other hand, we also have not located any *California* decisions to the contrary. The Federal courts, however, have addressed this issue directly. In a recent case, *United States* v. *Tate* (1982) 694 F.2d 1217, the Ninth Circuit held the odor of ether insufficient probable cause to support issuance of a search warrant. Moreover, a decade ago the Seventh Circuit suggested in *United States* v. *Noreikis* (1973) 481 F.2d 1177 that evidence of the presence of four chemicals essential to the manufacture of PCP, *including ether*, might be insufficient by itself[4] to supply probable cause for issuance of a warrant to search a house.[5]

These Federal decisions share a similar rationale. Ether is only one of many chemical ingredients required to manufacture PCP and related drugs. Moreover, ether has many legitimate uses around homes, repair shops, and the like. Among other functions, it serves as a common solvent and is used to start engines. Accordingly, the odor of ether, unlike the odor of burning marijuana or other contraband, is consistent with lawful as well as criminal activity. It is not the equivalent of smelling the illicit drug itself. Hence the presence of ether, whether detected by the sense of smell or other senses, cannot supply probable cause for a search or an arrest without some further

---

[4]The *Noreikis* opinion is not crystal clear on this point. The majority upheld the warrant by ruling both supporting affidavits were sound, one reciting that *four* chemicals including ether used in manufacturing PCP were present on the premises, and a second reciting among other things that *thirteen* such chemicals were present. The dissenter found the second affidavit invalid and the first affidavit insufficient to demonstrate probable cause. A careful reading of the majority opinion in conjunction with the dissent suggests the majority also *probably* found the first affidavit insufficient by itself to support the search warrant without assistance from the far more incriminating allegations of the second.

[5]The Seventh Circuit opinion, in turn, endorsed a District Court case *United States* v. *Failla* (W.D.N.Y. 1972) 343 F.Supp. 831 holding that evidence which revealed a suspect purchased substantial quantities of an unusual chemical used to make PCP could not support an arrest without warrant, even when corroborated by observations of "drug parties" at the suspect's home.

evidence establishing the chemical probably is being used for an illegal purpose, rather than one of its many legitimate functions. (*United States* v. *Tate, supra,* 649 F.2d at p. 1221.)

*People* v. *Patterson* (1979) 94 Cal.App.3d 456 [156 Cal.Rptr. 518] is the California case which comes closest to holding the odor of ether sufficient to establish probable cause for warrantless entry and search of a dwelling. However, *Patterson* is readily distinguished from *Tate* and *Noreikis.* In *Patterson,* the officers possessed two important pieces of evidence suggesting the presence of PCP, not merely ether, before they even approached the suspect's premises. A confidential informant had advised them PCP was being sold from that house. And one of the officers had called the suspect's house and arranged to buy some PCP. Thus, when the officers entered and smelled ether in the next room they had probable cause to believe this particular ether was being used for an illegal purpose, rather than one of its legitimate functions.

Here Officer Pytel possessed no evidence the ether he smelled coming from Dickson's residence was being used for illegal purposes. Nor did he set up a surveillance as did the officers in *Tate.* In fact, at the time Officer Pytel and his fellow officers drew their guns and embarked on their unswerving course to enter Dickson's home, they did not know how many people were present or who they were, and only the sound of a radio or television suggested anyone at all was inside the dwelling.

To decide this case, however, we need not rule whether *United States* v. *Tate* or its rationale should apply in California courts to invalidate *search warrants* procured on the basis of the smell of ether. For even if the odor of ether provides ample probable cause for a *search warrant,* it does not supply the quantum of probable cause required to justify a *warrantless search of a dwelling.* ▆ "[I]n a doubtful or marginal case a search under a warrant may be sustainable where one without it would fail." (*United States* v. *Ventresca* (1965) 380 U.S. 102, 106 [13 L.Ed.2d 684, 85 S.Ct. 741].) Indeed the United States Supreme Court has held that mere smell cannot constitute sufficient probable cause for that type of search and seizure, even if what is smelled is contraband.

In *Taylor* v. *United States* (1932) 286 U.S. 1 [76 L.Ed. 951, 52 S.Ct. 466], the Court held the plain smell of contraband, in this instance whiskey, emanating from a garage did not justify a warrantless entry and search of that garage. "Prohibition officers may rely on a distinctive odor as a physical fact indicative of possible crime; but its presence alone does not strip the owner of a building of constitutional guarantees against unreasonable search." (286 U.S. at p. 6 [76 L.Ed. at p. 953]. In a succeeding case,

*Johnson* v. *United States* (1948) 333 U.S. 10, 13 [92 L.Ed. 436, 68 S.Ct. 367], the Court expressly held that the plain smell of opium was enough to obtain a search warrant; however, it could not be enough for a warrantless search of that same premises. "We cannot sustain defendant's contention, erroneously made, on the strength of *Taylor* v. *United States,* . . . that odors cannot be evidence sufficient to constitute probable grounds for any search. That decision held only that odors alone do not authorize a search without warrant. If the presence of odors is testified to before a magistrate and he finds the affiant qualified to know the odor, and it is one sufficiently distinctive to identify a forbidden substance, this Court has never held such a basis insufficient to justify issuance of a search warrant." (333 U.S. at p. 13 [92 L.Ed. at p. 440].) (*Chapman* v. *United States* (1961) 365 U.S. 610 [5 L.Ed.2d 828, 81 S.Ct. 776].)[6]

Conceivably, one could argue that under California law the odor of contraband such as PCP itself could constitute probable cause for warrantless entry and search of a dwelling, if accompanied by exigent circumstances justifying the failure to seek a search warrant. *Guidi* v. *Superior Court* (1973) 10 Cal.3d 1 [109 Cal.Rptr. 684, 513 P.2d 908] held that olfactory evidence coupled with exigent circumstances was enough to support seizure and search of a container.[7] However, both the majority and concurring opinions in *Guidi* emphasized that at the time they discovered the container the officers already had entered the premises in a lawful manner and were engaged in a lawful search. (10 Cal.3d at pp. 6-7, 19.)

It also is true that several California appellate decisions have upheld the arrest and search of persons when officers detected the odor of contraband.

---

[6]These United States Supreme Court cases and their progeny teach us that officer Pytel would have lacked probable cause for a warrantless entry and search even if he smelled methaqualone itself, not just one of the ingredients of that illegal drug.

[7]Actually the "majority" opinion in *Guidi* did not endorse "plain smell" alone as sufficient for the warrantless search and seizure even of a container.

"We wish to emphasize that in this case the odor of contraband served to corroborate prior information as to where that contraband was. Here the container had been described in visual terms. Only after it had been visually located did the smell emanating from it enter into the constitutional calculation of reasonableness by corroborating the prior information identifying the bag as the container of contraband.

"We do not here hold that only the smell of contraband and nothing more would justify seizing a supposed container of the contraband, nor do we mean to accord 'plain smell' a place in Fourth Amendment doctrine equivalent to that occupied by 'plain sight'." (10 Cal.3d at p. 17, fn. 18.)

This limitation loses much of its force, however, because of a short concurring opinion filed by Justice Mosk joined by *three* other members of the court. This concurring opinion advocated that smell alone could justify warrantless search of a container, assuming the officers had lawfully entered the premises where the container was located. "I . . . continue to believe, that the sense of smell, . . . may be employed, not merely in confirmation of what is already visible, but in equal weight with the sense of sight in the determination of probable cause to search and seize." (10 Cal.3d at p. 20.)

(See, e.g., *People* v. *Fitzpatrick* (1970) 3 Cal.App.3d 824, 826-827 [84 Cal.Rptr. 78] [odor of marijuana on driver stopped for traffic infraction]; *People* v. *Miller* (1973) 33 Cal.App.3d 191, 194 [108 Cal.Rptr. 788] [arrest predicated on informant's tip and odor of marijuana]; *People* v. *Torres* (1981) 121 Cal.App.3d Supp. 9 [175 Cal.Rptr. 411] [arrest of driver for possession of PCP after detecting odor of ether and mint emanating from his person].) Other California cases have upheld searches of automobiles based on the odor of contraband *and* corroborating circumstances coupled with the inherent exigency of the vehicle's mobility. (See, e.g., *People* v. *Cook* (1975) 13 Cal.3d 663, 667-669 [119 Cal.Rptr. 500, 532 P.2d 148]; *People* v. *Weaver* (1983) 143 Cal.App.3d 926 [192 Cal.Rptr. 436]; 61 Met. News 72, p. 7 [warrantless search of interior of automobile predicated on odor of "PCP"]; *People* v. *Scott* (1979) 95 Cal.App.3d Supp. 8 [158 Cal.Rptr. 270]; cf. *Wimberly* v. *Superior Court* (1976) 16 Cal.3d 557 [128 Cal.Rptr. 641, 547 P.2d 417].)

Still, it is a considerable step beyond *Guidi* or the automobile cases to sanction an initial intrusion into a home where the officer's sole claim of probable cause is his sense of smell. Dwellings are entitled to more protection from governmental searches than are containers or automobiles.[8] It is a further—even longer—step when the odor detected by the officer is not the contraband substance itself, rather only a chemical which may be a component of that contraband yet also has other, legitimate uses. We decline to take these steps.

We find it unnecessary to reach the issue decided in *Tate*—that the smell of ether alone can never supply probable cause for a search or arrest warrant.[9]  ▆▆▆  But we do hold that the odor of ether alone is not enough

---

[8]"[F]or the purposes of the Fourth Amendment there is a constitutional difference between houses and cars." (*Chambers* v. *Maroney* (1970) 399 U.S. 42 at p. 52 [26 L.Ed.2d 419, 429, 90 S.Ct. 1975]; *Vale* v. *Louisiana* (1970) 399 U.S. 30 [26 L.Ed.2d 409, 90 S.Ct. 1969]; *Chapman* v. *United States, supra,* 365 U.S. 610; LaFave, Search and Seizure, *supra,* §§ 6.5, 2.3(b), 3.2(a).) In part this is because cars are mobile and buildings are not. But the Supreme Court also has emphasized that a "diminished expectation of privacy . . . surrounds the automobile." (*United States* v. *Chadwick* (1977) 433 U.S. 1, 12 [53 L.Ed.2d 538, 549, 97 S.Ct. 2476].)

[9]Officer Pytel did not seek either a telephonic or ordinary search warrant in this case. Consequently, we do not confront the issue which would have been raised were he to have properly submitted all the information which he *conceivably* possessed to the scrutiny of a neutral magistrate. Officer Pytel's hearing testimony was too sparse to allow more than a conjecture as to what he actually observed and the inferences his knowledge and experience would allow him to draw. He may have been in a position to submit an oral declaration or written affidavit reciting more than the smell of ether. As additional grounds for the search warrant he may also have been able to state he had observed bottles, jars and other *specified* types of equipment which, because of his knowledge and experience in narcotics investigations, he knew to be of the kind used in the manufacture of PCP and related drugs. Assuming he indeed was in a position to present those statements about his observations *and* his

to supply *probable cause* for a *warrantless* entry of a dwelling for the purpose of searching the premises.[10] Accordingly, officers should not infer from *Patterson* or California cases dealing with warrantless searches of persons, containers or automobiles that they have probable cause to enter a home without a warrant when the only evidence they have available is the aroma of ether emanating from that residence.

■ Nor can this entry and search be justified as incidental to a warrantless arrest.[11] Before entering the residence, the officers did not know who

---

expertise in a declaration or affidavit, it would appear he could have met the problem which bothered the Ninth Circuit in *Tate*. His declaration or affidavit would have provided evidence indicating the ether he detected was being used for an illegal purpose, rather than one of its many legitimate functions. In that event the declaration or affidavit presumably would even have satisfied the *Tate* standard.

[10]Whether the smell of ether constitutes "exigent circumstances" authorizing entry *without probable cause* is the subject of later discussion in this opinion, see pages 1060, *infra*.

[11]*People* v. *Bock Leung Chew* (1956) 142 Cal.App.2d 400 [298 P.2d 118], can be read to authorize an entry of a dwelling based on the "plain smell" of contraband on a warrantless arrest theory. In that case, officers were walking down a hallway of an apartment building. They detected the odor of opium emanating from one of the units. They knocked and were admitted by the defendant's wife. Once inside the apartment, the odor was stronger. They searched and found the residue of opium. The court upheld the "immediate entrance into and search of the apartment without first procuring a warrant" on a somewhat novel rationale: "Since the possession of opium is a felony officers who detect the odor of opium are entitled to believe that the felony of possessing opium is being committed in their presence. We can see no logical distinction in this respect between something apparent to the sense of smell, and the same thing apparent to the sense of sight or to the sense of hearing." (*Id.* at pp. 402-403.)

In order to reach this conclusion, the *Bock Leung Chew* court had to expressly refuse to follow contrary United States Supreme Court authority. "It is true that, with four justices dissenting, the Supreme Court of the United States, in *Johnson* v. *United States*, 333 U.S. 10, . . . held that federal officers who smelled the fumes of burning opium coming from a residence were not justified in entering the residence without a warrant. With all due respect to the justices of that court who joined in this holding, we cannot follow their reasoning and agree rather with the four justices who dissented." (*Id.* at p. 403.)

This cavalier attitude toward United States Supreme Court decisions was justified on an "independent state grounds" approach, relying on language from *People* v. *Cahan* (1955) 44 Cal.2d 434 [282 P.2d 905, 50 A.L.R.2d 513]: " 'In developing a rule of evidence applicable in the state courts, this court is not bound by the decisions that have applied the federal rule, and if it appears that those decisions have developed needless refinements and distinctions, this court need not follow them. Similarly, if the federal cases indicate needless limitations on the right to conduct reasonable searches and seizures or to secure warrants, this court is free to reject them.' " (142 Cal.App.2d at p. 403 quoting 44 Cal.2d at pp. 450-451.)

*Bock Leung Chew* can no longer be considered to represent a valid statement of California law for two reasons. First, both this case and *Cahan* were decided before *Mapp* v. *Ohio* (1961) 367 U.S. 643 [6 L.Ed.2d 1081, 81 S.Ct. 1684, 84 A.L.R.2d 933] which made Federal search and seizure law binding on the states. Thus, *Johnson,* its antecedents and progeny must now be followed not rejected by California appellate courts. And, subsequent reliance on *Bock Leung Chew* in *Vaillancourt* v. *Superior Court* (1969) 273 Cal.App.2d 791 [78 Cal.Rptr. 615] was misplaced. Secondly, later *California* Supreme Court cases are inconsistent with the holding of *Bock Leung Chew*. The warrantless entry for purpose of effecting a warrantless arrest would clearly fail under *People* v. *Ramey* (1976) 16 Cal.3d

was present nor how many. They did not know whether the person who came to the door was the owner or a visitor. They did not know whether he was connected with whatever illegal activity might be taking place inside the house or merely an innocent bystander. Indeed Officer Pytel did not claim to have arrested Dickson until the officer had entered and found the narcotics lab and also determined Dickson was the only occupant of the premises.

### IV. Assuming the Officers Possessed Probable Cause Sufficient for Search of a Dwelling, They Lacked the Accompanying Exigent Circumstances Needed to Excuse the Failure to Obtain a Warrant

We are quite confident the present state of the law supports our conclusion that the mere smell of ether, without more, fails to constitute probable cause for a warrantless entry and search of a dwelling. Nonetheless, we recognize this issue arises in a rather unsettled area of the law. In an abundance of caution, we therefore ask a further question:

■ Assuming we held the odor of ether alone sufficient to furnish *the quantum of probable cause* required for a warrantless entry and search, would that finding justify the officers' entry and search of the residence in this case?

The answer is no. Indeed officers normally are not entitled to enter and search a dwelling without a warrant even if they possess an overwhelming quantity of evidence establishing the presence of contraband or other seizable items on the premises. "Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for a search of that place without a warrant. And such searches are . . . unlawful notwithstanding facts unquestionably showing probable cause." (*Agnello* v. *United States* (1925) 269 U.S. 20, 33 [70 L.Ed. 145, 149, 46 S.Ct. 4, 51 A.L.R. 409]; overruled on other grounds, *United States* v. *Havens* (1980) 446 U.S. 620 [64 L.Ed.2d 559, 100 S.Ct. 1912].)

The strongest conceivable probable cause will support a warrantless entry for purposes of searching a dwelling only if accompanied by "exigent circumstances." And even that proposition is in some doubt. A leading commentator observes that the United States Supreme Court has never upheld a warrantless entry and search of a dwelling on grounds exigent circumstances

---

263 [127 Cal.Rptr. 629, 545 P.2d 1333], no matter what the source and degree of their probable cause, since the officers lacked exigent circumstances. And, somewhat less clearly, the sole reliance on the sense of smell would not pass muster under *People* v. *Marshall* (1968) 69 Cal.2d 51 [69 Cal.Rptr. 585, 442 P.2d 665] nor even the majority opinion in *Guidi* v. *Superior Court, supra,* 10 Cal.3d 1. But on this latter issue see the concurring opinion in *Guidi,* 10 Cal.3d at page 20.

excused the failure to obtain a search warrant except where the entry was for the purpose of arresting a specific person. (LaFave, Search and Seizure, *supra*, § 6.5(a) and cases cited therein. But see *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942] approving warrantless searches after firemen have extinguished a fire on the premises to be searched.) Supreme Court authority for this exception to the warrant requirement rests primarily on several decisions *disapproving* warrantless searches but where the Court took pains to point out the officers had failed to demonstrate exigent circumstances. (*Vale* v. *Louisiana, supra,* 399 U.S. 30; *Chapman* v. *United States, supra,* 365 U.S. 610; *United States* v. *Jeffers* (1951) 342 U.S. 48; *McDonald* v. *United States* (1948) 335 U.S. 451 [93 L.Ed. 153, 69 S.Ct. 191]; *Johnson* v. *United States, supra,* 333 U.S. 10.) Nonetheless, lower Federal courts *have* sanctioned warrantless entries and searches of dwellings expressly because exigent circumstances were found to excuse the absence of a warrant. (*United States* v. *Rubin* (3d Cir. 1973) 474 F.2d 262; *United States* v. *Curran* (9th Cir. 1974) 498 F.2d 30.) And some California decisions uphold this same exception. (*People* v. *Superior Court (Cope)* (1980) 103 Cal.App.3d 186 [162 Cal.Rptr. 667]; cf., *People* v. *Ramey, supra,* 16 Cal.3d 263; *Cleaver* v. *Superior Court* (1979) 24 Cal.3d 297 [155 Cal.Rptr. 559, 594 P.2d 984].)

Supreme Court dicta and holdings by other courts describe several species of "exigent circumstances" which might justify a warrantless search of a dwelling in appropriate circumstances. Principal among these are hot pursuit of a fleeing felon and threatened destruction or removal of evidence. (LaFave, Search and Seizure, *supra,* § 6.5(a)-(c) and cases cited therein.)

Nothing in the record suggests Officer Pytel had reasonable grounds to believe either of these exigent circumstances existed. Officer Pytel clearly was not chasing a felon who had fled into the residence from which he detected the odor of ether. And he did not claim to have spotted any activity within the residence which would suggest narcotics or any other evidence was threatened with destruction or removal. In an analogous case, *Chapman* v. *United States, supra,* 365 U.S. 610, officers detected a strong odor of whiskey mash emanating from a dwelling. Without a warrant but with the landlord's permission, they entered and searched the tenant's dwelling. Dismissing the officer's claim of exigent circumstances, the court recited: "'No suspect was fleeing or likely to take flight. The search was of permanent premises, not of a movable vehicle. No evidence or contraband was threatened with removal or destruction, except perhaps the fumes which we suppose in time would disappear.'" (365 U.S. at p. 615 [5 L.Ed.2d at p. 833], quoting *Johnson* v. *United States, supra,* 333 U.S. at p. 15 [92 L.Ed. at p. 441].) Here, as in *Chapman* and *Johnson,* only the fumes Officer Pytel

smelled were in any danger of vanishing before a warrant could be obtained.[12]

We hold Officer Pytel had no valid reason to forego a search warrant in this case.[13] Accordingly, the officers' warrantless entry and search was unlawful even were the smell of ether deemed to constitute sufficient probable cause for such a search.

### V. "Exigent Circumstances" Excusing Officers From the Requirements of Penal Code Section 844 Cannot Cure the Absence of Probable Cause Nor the Absence of an Excuse for Failing to Obtain a Warrant

Much of the discussion in the 1538.5 hearing and the briefs on appeal focused on the issue of whether the officers complied with the "knock and notice" requirements of Penal Code section 844 or were excused from adhering to that statute because of "exigent circumstances." We find it unnecessary to address this issue directly.

Penal Code section 844 defines the protocol officers are to follow when conducting warrantless entries for purposes of arrest.[14] These measures are designed primarily to minimize the possibilities of misunderstanding and resistance by the occupants. Exigent circumstances sometimes excuse compliance with the provisions of Penal Code section 844. And some of these exigent circumstances sound similar to those which excuse compliance with the warrant requirement—the destruction of evidence, for example. Yet, in a real sense, they are not the same. They are different because they excuse different search and seizure requirements. The danger evidence may be destroyed while waiting to obtain a search warrant is not the same as the danger evidence will be destroyed if officers announce their presence and

---

[12]Thus, the instant case contrasts with *United States* v. *Erb* (10th Cir. 1979) 596 F.2d 412. In that decision the court upheld a warrantless search. It first found ample probable cause to conclude a PCP laboratory was in operation. The court then found reasonable grounds to believe the laboratory would be dismantled and moved before a search warrant could be obtained.

[13]A third specie of exigent circumstance mentioned in some of the cases—responding to an emergency—can justify warrantless entry and search of a dwelling with or without probable cause to believe contraband or other evidence is located within. However, this is a unique brand of exigent circumstance with its own particular qualifications. For reasons explored fully later in this opinion (see p. 1062), we find this exception also is unavailable to excuse the failure to obtain a warrant in this case.

[14]"To make an arrest, a private person, if the offense be a felony, and in all cases a peace officer, may break open the door or window of the house in which the person to be arrested is, or in which they have reasonable grounds for believing him to be, after having demanded admittance and explained the purpose for which admittance is desired."

await a response before entering. Facts suggesting the latter danger is present by no means justify dispensing with a warrant. Officers can entertain a reasonable belief that once their presence is known the occupants will rapidly move to dispose of incriminating evidence. This does not mean they necessarily have reason to anticipate evidence will be destroyed while they remain quietly in hiding awaiting a search warrant.

We hold Officer Pytel lacked probable cause for a warrantless entry of a dwelling or, even assuming probable cause to enter and search, we hold he lacked the sort of exigent circumstances which would excuse his failure to obtain a warrant. Consequently, it becomes irrelevant whether he and the other officers complied with the "knock and notice" required in carrying out the warrantless entry of this residence. The entry and subsequent search would be unlawful even if the officers religiously followed the mandates of Penal Code section 844. Consequently, whether "exigent circumstances" excused them from complying with "knock and notice" likewise is irrelevant.

## VI. The Officers Lacked an "Exigent Circumstances" Motive Sufficient to Substitute for Their Lack of Probable Cause

We now turn to the other "exigent circumstances" justification for Officer Pytel's nonconsensual, warrantless entry of Dickson's home. Both California and Federal courts have long recognized certain types of "exigent circumstances" can excuse the absence of warrants, indeed can excuse the absence of probable cause to believe criminal activity or seizable items of any kind will be found in a dwelling or other premises. Sometimes called emergency entry searches or simply the emergency doctrine, this exception to traditional search and seizure constraints is grounded on the sensible premise that the officers are not entering for purposes of searching or seizing or arresting. Rather they are entering for an independent motive—to protect persons or property against some imminent peril. (See, e.g., *People* v. *Roberts* (1956) 47 Cal.2d 374 [303 P.2d 721]; *People* v. *Smith* (1972) 7 Cal.3d 282 [101 Cal.Rptr. 893, 496 P.2d 1261]; Witkin, Cal. Evidence, *supra,* § 92; LaFave, Search and Seizure, *supra,* § 6.5(d); Mascolo, *The Emergency Doctrine Exception to the Warrant Requirement Under the Fourth Amendment* (1973) 22 Buffalo L.Rev. 419.)

Typically officers will have a reasonable belief someone is in the process of being injured or threatened with harm inside a building. It is unnecessary the police have probable cause—or even mere suspicion—that the injury or harm is being inflicted as a result of criminal conduct. In fact, the injury or threatened harm may be the result of illness or accident. It is the policeman as savior of life and property rather than the policeman as criminal inves-

tigator who swings into operation. In that role, he need not have probable cause concerning criminal conduct before entering our homes in the fastest possible way, breaking down doors or windows, if necessary, and even without warning if that would unduly delay the "rescue."

The leading California case on exigent circumstances as a substitute for probable cause, *People* v. *Roberts, supra,* 47 Cal.2d 374, 378, acknowledged, however, a real concern "exigent circumstances" not be used as a pretext for disregarding the constitutional protections against unlawful searches and seizures. This concern has been echoed by Federal courts (e.g., *United States* v. *Dunavan* (6th Cir. 1973) 485 F.2d 201, 204) and commentators). "There is the . . . ominous possibility that police assertions of Good Samaritan motives could be only a pretense." (Note, *The Emergency Doctrine, Civil Search and Seizure, and the Fourth Amendment* (1975) 43 Fordham L.Rev. 571, 587.)

The risk "exigent circumstances" will be used as a pretext is especially grave when officers have some suspicion, short of probable cause, that criminal activity is under way on the premises they intend to invade. This is not to say an officer's motives must be completely pure when he enters with the avowed purpose of protecting life and property. Clearly when an officer hears gunfire and screams of pain inside a house he may rush in with an investigator's curiosity as well as the savior's desire to save lives. But where mixed motives are possible the courts must be alert the savior's image is not merely pretence for an unconstitutional invasion of a suspect's private home.

Without entering the policeman's head, we can never be certain whether he was thinking as a savior or an investigator. ■ However, where as here the "exigent circumstances" rest on a claimed imminent threat of danger to life and property, we hold the court is entitled to ask at least two questions. First, the objective test: was the threat so imminent and serious a reasonable policeman would believe that a warrantless, emergency entry was necessary to save lives and property? And, second, the subjective test: was this officer indeed motivated primarily by a desire to save lives and property?

We have found no California decision which explicitly articulates this two phase objective/subjective test. However, the germ of both branches of the test is contained in the leading California Supreme Court case sanctioning "exigent circumstances" as a substitute for probable cause, *People* v. *Roberts, supra,* 47 Cal.2d 374. Moreover, recent well-reasoned cases in other jurisdictions have spelled out just such criteria in some detail and applied them to these emergency entry searches.

The relevant language in *Roberts* appears in two sentences: "The trial court found that the officers *reasonably* believed that someone inside the apartment was in distress and in need of assistance and that they entered *for the purpose* of giving aid. Necessity often justifies an action which would otherwise constitute a trespass, as where the act is prompted by the *motive* of preserving life or property and *reasonably* appears to the actor to be necessary for that purpose." (47 Cal.2d at pp. 377-378.) (Italics supplied.)

Logically parsing this statement yields two independent requirements. First, the objective test—the officer "reasonably believed" an immediate entry was necessary to preserve life or property—and second, the subjective test—the officer's action was "prompted by the motive of preserving life or property."

In this opinion, we merely expand on the Supreme Court's brief statement of the appropriate test in ways we feel are consistent with the essence of its holding. We draw comfort from the fact that when the highest courts of three sister states recently set out to articulate more detailed criteria they arrived at something very similar to our formulation.

The New York Court of Appeals appears to have been the first to enunciate a detailed standard for judging the constitutionality of emergency entry searches. In 1976, that court held: "The first requisite is that the police have valid reasons for the belief that an emergency exists, a belief which must be grounded in empirical facts rather than subjective feelings . . . . [¶] The second requirement is related to the first in that the protection of human life or property in imminent danger must be the motivation for the search rather than the desire to apprehend a suspect or gather evidence for use in a criminal proceeding." (*People* v. *Mitchell* (1976) 39 N.Y.2d 173, 178 [383 N.Y.S.2d 246, 347 N.E.2d 607].) In 1980, the Wisconsin Supreme Court expressly followed the New York court's lead, but elaborated further. Thus *State* v. *Prober* (1980) 98 Wis.2d 345 [297 N.W.2d 1], contains a still more mature statement of the criteria to be applied in reviewing the validity of emergency searches. "[T]he test for a valid warrantless search under the emergency doctrine requires a two-step analysis. First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, even though the requisite motivation is found to exist, until it can be found that a reasonable person under the circumstances would have thought an emergency existed, the search is invalid. Both the subjective and objective tests must be met." (*State* v. *Prober* (1980) 98 Wis.2d 345 [297 N.W.2d 1, 12].) Then in 1982, the Washington Supreme Court adopted the *Prober* test in toto and applied

it to invalidate a warrantless search. (*State* v. *Loewen* (1982) 97 Wn.2d 562 [647 P.2d 489, 493].)[15]

We find this two-pronged test to be a logical derivative of the California Supreme Court's holding in *Roberts*. Accordingly, we do not hesitate to apply it in this case. In measuring officer Pytel's conduct against this standard, we choose to invoke the objective standard first.[16]

A. *Under the Circumstances of this Case,*
*A Reasonable Officer Would Not Have Believed*
*The Threatened Harm Was Sufficiently Imminent To Require*
*Nonconsensual, Warrantless Entry*

█ The requirement the danger to life or property be *imminent* essentially means it is reasonable to anticipate the threatened injury will occur in such a short time that it is not feasible to obtain a search warrant. Thus it is not sufficient a reasonable officer would believe a condition exists inside a dwelling which could *sometime* seriously injure persons or property. Rather the reasonable officer would have to believe the injury is likely to occur before he could obtain a search warrant. In this era of telephonic search warrants, this means he has to anticipate the injury will occur within a very short time span. (Cf. *People* v. *Ellers* (1980) 108 Cal.App.3d 943, 950 [166 Cal.Rptr. 888], warrantless entry to arrest not justified by concern narcotic evidence would be sold before warrant could be obtained because telephonic warrants are now available; *In re Johnny V.* (1978) 85 Cal.App.3d 120, 128 [149 Cal.Rptr. 180].)

█ The officers here apparently sought to justify the warrantless entry because of an imminent danger posed by the combustible nature of ether. But is ether inherently so combustible under all circumstances that a reasonable policeman would regard it necessary to rush into a house without a warrant and without consent merely because he smelled the odor of that substance? Remember Officer Pytel was not a narcotics investigator expert in the properties of ether. He had received some nominal training in the general area of narcotics. But he had participated in only three PCP cases, and then his role was limited to aiding in the execution of search warrants.

---

[15]At least one Federal court has expressly required both subjective motive and objective reasonableness to justify an emergency entry search. (*Root* v. *Gauper* (8th Cir. 1971) 438 F.2d 361, 364, 365.)

[16]In this case, we choose to apply both prongs of the test and find Officer Pytel's action failed both. However, in like circumstances other courts may prefer not to invoke the subjective standard. Sometimes an examination of the objective facts will reveal a reasonable officer would not have deemed the threat that serious and imminent. If so, a court has the option to forego the more delicate task of discerning the officer's actual motive in making the warrantless entry.

The *Tate* case itself teaches us that experienced narcotics investigators do not regard ether to be so dangerous they must rush into a home the first time they detect its odor. In *Tate* the ether scent was at least as strong as in the present case. Indeed the aroma was so powerful a neighbor smelled it and reported it to the police. In contrast the uncontroverted testimony of nearby neighbors in the instant case was to the effect that the odor of ether, if any, was not strong enough to reach their homes.

In any event, despite the powerful odor emanating from the house in *Tate,* this team of expert narcotics specialists found it unnecessary to the preservation of person and property to immediately invade the house. Instead they conducted an investigation to personally confirm the neighbor's report about the strong odor of ether. They then sought a regular search warrant not a telephonic version despite the additional delay entailed by that choice. While awaiting arrival of the warrant, they continued surveillance of the house. When some of the occupants drove off in a vehicle, the officers pursued and arrested them. Only after those arrests were made did the officers enter the house and execute the search warrant. In all, the officers in *Tate* delayed several hours after first detecting the scent of ether before entering the home.

Similarly, in *United States* v. *Baldwin* (5th Cir. 1982) 691 F.2d 718, a Drug Enforcement Agency (DEA) agent with "extensive drug enforcement experience" waited *two full days* after detecting the odor of ether before entering a home. On his first surveillance, June 22, 1981, he and accompanying officers smelled ether. On the basis of that odor and other observations, the DEA agent obtained a search warrant for a methamphetamine laboratory. He and his fellow officers returned the following day, June 23, with the warrant and continued surveillance. Once again they smelled the scent of ether. Nonetheless, "no human activity was observed and the officer left without executing the search warrant." On June 24, the officers returned a third time, and again detected ether. They finally observed a suspect on the premises. Even then the DEA agent took the time to withdraw and make a telephonic correction in the search warrant. Later that day the officers executed the warrant. Obviously, this experienced drug enforcement officer felt the risk of explosion or fire from a PCP laboratory was so negligible he had enough time not only to obtain an ordinary search warrant but to wait an extra day to execute the warrant in order to nab the operator of the lab.

In *United States* v. *Clayborne* (10th Cir. 1978) 584 F.2d 346, DEA agents surveilled a commercial building for a full day after detecting the odor of ether and other circumstances which evidenced an operating methamphe-

tamine laboratory. Only after that day of surveillance and taking the time to obtain a search warrant did the agents enter and search the premises.

If experienced narcotics investigators like those in *Tate, Baldwin* and *Clayborne* do not find the presence of ether so dangerous as to necessitate an immediate, warrantless entry, it is difficult to argue an ordinary patrol-man inhaling the identical odor had a *reasonable* belief the threat was so imminent he needed to rush into defendant's home without a warrant or consent.

We do not mean to suggest ether can never be dangerous enough to justify a warrantless emergency entry. In some instances, circumstances may suggest combustion is imminent.[17] If so, officers are entitled to take immediate steps calculated to prevent injury and damage, including entering a home or other building without permission or a warrant where that is absolutely essential. But the odor of ether emanating from a home cannot in and of itself establish the requisite degree of urgency. Imminence connotes a high probability that something will happen and that the event will occur in the very near future. The odds that a narcotics laboratory will explode or catch fire during any given hour—or during a given day or week—are very slim. Otherwise no one would accept the risk of conducting such an operation.

If ether were so combustible that its mere presence signaled an imminent explosion, society would not have to worry about PCP and related drugs since all the laboratories would long ago have gone up in smoke or been abandoned. So would many hospitals, workshops, and the like, which also use ether on a regular basis. It is not enough for the emergency entry ex-

---

[17]A recent case decided by the Colorado Supreme Court, *People v. Clements* (Colo. 1983) 661 P.2d 267 presents an example where a court found the danger of ether combustion sufficient to justify a warrantless search. However, it should be highlighted that this case involved the warrantless search of an *automobile trunk,* not a dwelling. Whether the Colorado court would have found the same level of danger enough to support a warrantless entry and search of a dwelling still remains an open question after *Clements.*

In any event, in addition to the strong odor of ether, the *Clements* court found three other factors contributed to the imminency of the danger. (1) "The incident occurred on a hot July evening." This presumably aggravated the danger since the ether was confined in an automobile trunk which acts like an oven. Expert testimony identified heat as one of the conditions which could cause ether to explode. (2) "The ether was kept in an old whiskey bottle . . . ." which might easily break if jostled. (3) "[T]he ether was situated above the gas tank," hence turning the entire car into a "'time bomb' waiting to explode." (*Id.* at p. 271.)

In the instant case, by way of contrast, it was autumn, with no evidence the night was especially warm. More significantly, Officer Pytel had no reason to suspect the ether he detected was confined in some metal oven-like environment which might magnify the outside temperature. He also had no reason to suspect it was in a breakable container. Even if it were, the ether was not being carried in a movable vehicle where it was subject to jostling. Nor was there evidence the ether was situated near a large tank of flammable liquid, such as gasoline.

ception that ether is *capable* of exploding under certain circumstances. Something else must be present suggesting one or more of those circumstances exists and thus a reasonable person would have a reasonable belief that an explosion is about to occur.[18]

### B. *The Officer's Conduct Was Inconsistent With A Primary Motive to Save Lives and Property*

Even were we to assume that Officer Pytel could have entertained a reasonable belief ether was about to explode in appellant's home, we still must apply the subjective prong of the test: was Officer Pytel indeed motivated primarily by a desire to save lives and property rather than to search for evidence of criminal conduct? In assessing Officer Pytel's motives, we look primarily to his *actions* from the moment he whiffed the ether to the time he and his fellow officers forced their way into appellant's home. The Wisconsin Supreme Court noted the importance of an officer's conduct when applying the subjective prong of the test. "The purpose of the search may . . . be discerned from its scope and the manner in which it is conducted. Conduct by the searching officer which is inconsistent with the purported reason for the entry is cause for skepticism." (*State* v. *Prober, supra,* 297 N.W.2d at p. 12.)

▮ Construing the evidence most favorably to the prosecution, we do not find Officer Pytel was motivated primarily by a desire to save lives or property. Instead we find his conduct more consistent with the steps one would anticipate an officer might take in executing a search for a suspected PCP laboratory.

Shortly after first smelling the ether odor Officer Pytel crept up the outside stairway to appellant's home. From that vantage point he heard the sound of a radio or television and thus had some reason to believe the house was occupied. If overwhelmed with concern about the imminent danger to life and property, presumably Officer Pytel would have immediately called out a warning that an explosion or fire could occur any moment. But instead the officer crept quietly back down the stairs and called for backup units.

True, Officer Pytel also called the fire department for assistance. However, that action is entirely compatible with an intent to conduct a search

---

[18]Contrary to the brief citation in one compilation, Bell's Searches, Seizures and Bugging Compendium, *People* v. *Stone* (1983) 139 Cal.App.3d 216 [188 Cal.Rptr. 493] does not hold an ether odor justifies a warrantless entry because of the danger of explosion. Instead *Stone* addressed a very different issue—may defense counsel cross-examine officers about their behavior in *other* searches of PCP laboratories in order to establish a pattern of claiming "exigent circumstance" as a pretext to avoid the need for search warrants.

for a narcotics laboratory. Amidst the turmoil of a raid there is real danger of combustion; even more so if the officers feel compelled to fire the weapons they had withdrawn from their holsters before approaching defendant's home. Thus calling for fire department units appears to be nothing more than a wise precaution when planning a raid on a suspected PCP laboratory or storehouse. In this context, therefore, this conduct fails as an indication Officer Pytel was on a mission of mercy when he and his fellow officers rushed defendant's home.

Other conduct also was inconsistent with a subjective belief an explosion was imminent. The trial judge accepted Officer Pytel's assertion he evacuated some houses on one side of appellant's residence. However, according to the uncontroverted testimony of neighbors on the other side and directly across the street none of the officers attempted to evacuate them. Nor did the officers warn any of these neighbors an explosion or fire was imminent or even possible. Indeed several officers established a base in a home only two doors from appellant's residence. They allowed the residents to remain and did not mention anything about a dangerous situation of any kind in the neighborhood. Another witness testified he approached within a few feet of appellant's residence while the police were present. No officer warned him away.

Still further doubt is cast on Officer Pytel's true motives by the elapse of time from first whiff of ether to the warrantless entry of appellant's home. After creeping back down the stairway and calling for backup units and the fire department, Officer Pytel waited another 30 to 45 minutes. If one truly senses an imminent danger to life and property, one seldom waits around anywhere from a half-hour to an hour or more[19] before attempting to effect a rescue.

Indeed Officer Pytel had ample time to seek a telephonic warrant[20] or an ordinary warrant. If he thought he had probable cause for a search, that is what he should have done. On the other hand, if Officer Pytel feared an imminent explosion or fire in the house, he should have immediately sought to warn the occupants away from appellant's home and taken other imme-

---

[19]The record is not clear as to the total time which elapsed between the detection of the odor of ether and the entry into the residence. Officer Pytel conceded waiting another 30-45 minutes at a neighbor's home after completing his reconnoiter of the premises and his calls for backup units and the fire department. It seems reasonable to estimate the total elapsed time at between 45 minutes and something over an hour.

[20]In *People* v. *Morrongiello* (1983) 145 Cal.App.3d 1 [193 Cal.Rptr. 105], a decision we filed this date, the officers found time to obtain a telephonic search warrant and a telephonic amendment to that warrant while engaged in various phases of a field investigation following up an informant's tip. The warrant and amendment were each secured from the magistrate in a matter of minutes.

diate steps to prevent injury and damage *within* defendant's home as well as in the neighborhood.[21]

Whether the officers' conduct in *People* v. *Patterson, supra,* 94 Cal.App.3d 456 would have survived our two-step analysis had it been applied by that court we need not consider. It is enough the facts of *Patterson* can be distinguished from the instant case. First, in *Patterson* the officers had probable cause—independent of the sense of smell—to believe that PCP was being manufactured within the dwelling *before* they sought entry. Indeed they had probable cause to believe the manufacturing process was underway and nearing completion. Hence they did not have to rely on "exigent circumstances" to substitute for their lack of probable cause, only to excuse the failure to obtain a warrant. Second, the principal officer involved in *Patterson* was a narcotics specialist with eight years' experience in that field. He testified to his conclusion as an expert from the several circumstances known to him that there was an imminent danger of explosion. In contrast, Officer Pytel was an ordinary patrolman with minimal training and experience in narcotics investigations. The only circumstance known to him was what his nose told him about the presence of ether.

Third, and more important, the conduct of the officers in *Patterson* was consistent with a motive of preventing an explosion or fire from occurring. They went directly to the home involved and entered as soon as possible. This contrasts sharply with Officer Pytel's behavior. As will be recalled, Pytel first climbed the outside stairway, found an open door and heard a radio or television playing from within appellant's home. Then instead of doing something to alleviate the alleged imminent danger he returned down the stairway and waited another 30 to 45 minutes before entering to "rescue" the persons and property inside the house.

## VII. Summary

Under the circumstances of this case, we hold Officer Pytel could not reasonably believe the odor of ether alone established an imminent threat of serious damage to life or property within defendant's home. Furthermore, we find Officer Pytel's conduct was inconsistent with that belief or with a

---

[21]Although the officers' behavior after the entry could not have changed the motive with which they entered, we note their conduct only corroborated our finding that the real objective was to search for evidence not prevent harm. Upon entering appellant's residence, the officers did not secure the premises and seek a search warrant based on any evidence they may have detected during that process. Rather they undertook a thorough two-hour search aided by a police chemist without ever seeking a warrant. This behavior contrasts with the actions of officers in other cases involving emergency entries of narcotics laboratories. (See, e.g., *United States* v. *Erb, supra,* 596 F.2d at p. 417, *People* v. *Stone, supra,* 139 Cal.App.3d at p. 219.)

timely and appropriate attempt to prevent imminent harm to the persons and property which might be located in appellant's home. Instead we find Officer Pytel's behavior in this case to be most compatible with a raid on a suspected PCP laboratory or storage place, a raid for which he lacked a search warrant or sufficient probable cause for a warrantless search. The warrantless entry and subsequent search of appellant's home constituted an unreasonable search and seizure and thus a violation of appellant's constitutional rights. The evidence seized pursuant to that unlawful action must be suppressed.

We are further supported in this decision by the unfortunate consequences were we to hold to the contrary. Were we to uphold warrantless searches at the first whiff of ether while the Ninth Circuit is overturning search warrants based on those same odors, we would be sending the wrong signal to law enforcement. We might discourage careful investigations of suspected narcotics laboratories using specialists in narcotics. And, we certainly would be discouraging officers from submitting evidence about suspected illegal drug manufacturing activities to the scrutiny of a neutral magistrate. Rather we would be encouraging all officers—ordinary patrolmen as well as narcotics specialists—to immediately invade any home or other building which emitted ether fumes.

We are also concerned about the consequences for effective law enforcement were we to hold that the odor of ether alone supplied reasonable grounds to believe life and property were in imminent danger. Investigators would lose much of their flexibility in field investigations of PCP and related drugs.

Police officers have a responsibility to save lives and property at least equal to their duty to investigate crime. If the mere odor of ether indeed signalled an imminent danger to lives or property, at the first whiff of that odor officers would be obligated to immediately effect a rescue. And they would have that responsibility no matter what the consequences for any criminal investigation which might be underway. Thus, the officers would not be free to surveil a house for a few hours or days hoping to identify who was involved in the manufacture or distribution of the narcotic substances being made on those premises. Once they smelled ether they would have to terminate the investigation and charge to the rescue. Indeed unless an "emergency" is so grave it *compels* officers to drop their investigation it is not the sort of emergency which justifies warrantless entry of a home.

The instant search presents the extreme case. To uphold Officer Pytel's actions we would be required to hold that the smell of ether coming from a residence, in and of itself, compels a reasonable belief that explosion or fire

is imminent. We suspect this single symptom occurs frequently during drug investigations.

Police officers cannot pick and choose. They cannot declare the simple odor of ether to be an emergency necessitating an immediate warrantless entry of a dwelling one day, then on the next day smell ether at another dwelling yet lie in wait for hours or days because they hope the principal operator of the suspected laboratory and his henchmen might soon appear.[22] The mere smell of ether either signals an imminent threat to life or property, or it does not. If it does, the officers have an obligation to enter immediately and deal with that threat any time they detect the odor. If it does not, they have the option of conducting a thorough criminal investigation, identifying all the participants, then obtaining a search warrant and entering the premises at the optimum moment. (See, e.g., *United States* v. *Baldwin, supra,* 691 F.2d 718; *United States* v. *Clayborne, supra,* 584 F.2d 346.) In the long run, we suspect law enforcement would be better off if it retained this flexibility instead of being compelled to rush in at the first scent of ether.

## DISPOSITION

The trial court's denial of appellant's motion to suppress under Penal Code section 1538.5 is reversed. The cause is remanded for further proceedings consistent with this reversal and the views expressed in this opinion.

Schauer, P. J., and Thompson, J., concurred.

A petition for a rehearing was denied July 28, 1983, and respondent's petition for a hearing by the Supreme Court was denied September 21, 1983. Richardson, J., was of the opinion that the petition should be granted.

---

[22]On some occasions additional circumstances will be present indicating an ether combustion is imminent. When those circumstances arise, officers have a responsibility to immediately take whatever steps are necessary, including an emergency entry of the premises, to prevent an explosion or fire. Yet under our ruling when those additional circumstances are not present, officers remain free to conduct whatever investigation they like of whatever duration they deem appropriate even after detecting the presence of ether. However, if we were to hold the mere smell of ether itself evidenced an imminent threat to life and property, no other additional circumstances would be necessary. The responsibility to enter and rescue would be there every time; the responsibility would be compelling; and it would be immediate, no matter what that might mean for the criminal investigation.