[Crim. No. 43179. Second Dist., Div. Seven. Sept. 30, 1983.]

THE PEOPLE, Plaintiff and Respondent, v.
NIGEL KENNETH BLACKWELL et al., Defendants and Appellants.

648

---

**COUNSEL**

Cynthia K. Cohan and Teri Schwartz, under appointments by the Court of Appeal, for Defendants and Appellants.

John K. Van de Kamp, Attorney General, Norman H. Sokolow and Otis D. Wright, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**THOMPSON, J.**—Defendants Nigel Blackwell and Andres Robles appeal from the judgments entered upon their pleas of guilty to possessing piperidine and cyclohexanone with the intent to manufacture phencyclidine (Health & Saf. Code, § 11383, subd. (b)(1)). Defendants contend their suppression motion (Pen. Code, § 1538.5) should have been granted on grounds the evidence was unlawfully seized from Blackwell's residence. We agree that the warrantless reentry was not justified by exigent circumstances and accordingly will reverse the judgment.

The evidence at the suppression hearing, viewed in accordance with the standard of review of denial of a suppression motion (*People* v. *Leyba* (1981) 29 Cal.3d 591, 596-597 [174 Cal.Rptr. 867, 629 P.2d 961]), established that at approximately 3:30 a.m. on February 9, 1982, Los Angeles County Sheriff's Deputies James Mumby and Larry Boyce detected a strong chemical odor consistent with the odor of phencyclidine on West Calaveras Street, in Altadena. In addition to contacting other officers, Mumby called the fire department.

After initially investigating number 408, Mumby knocked on the door at the one family residence at number 411, while other deputies went around the rear. When Mrs. Blackwell opened the door, strong fumes, which Mumby associated with PCP, emanated from the house. Mumby pulled Mrs. Blackwell away from the house because of the danger of explosion or fire. Defendant Blackwell, who came to the door, was also removed from the doorway, and Blackwell subsequently told Mumby that his friend and two children were in the house. Deputy Boyce yelled for the other persons to come out.

Meanwhile from the backyard Deputy John Jones heard a toilet flushing and saw defendant Robles standing in the bathroom "making a pouring motion into the toilet like he was possibly destroying evidence." Mumby heard Jones yell "Freeze, put your hands up," and "he is flushing it." Mumby and Boyce entered the residence and went to the bathroom where they found Robles standing among plastic buckets containing liquid and crusty looking substances. The deputies removed Robles and the two small children from the residence.

Then the firemen, who had arrived at the scene at about 3:45 a.m., opened the windows, ventilated the house and cut off the main gas supply to prevent any explosion. No neighbors, except the residents of 408 who had previously been contacted, were alerted or evacuated.

Raymond Wells, a criminalist and chemist employed by the sheriff's department arrived at about 5 a.m. and inspected the premises. Once inside he ascertained that, in his opinion the hydrocarbon levels were insufficient to worry about. He made a determination that the residence had been sufficiently ventilated. Since the gas was shut off, he "didn't expect the place to blow up at that time or catch on fire or anything like that." At that point he did not sense a deep urgency and exited the location to await the arrival of Narcotics Officer Charles Weathers.

Weathers arrived between 5 and 5:30 a.m. while the fire department was still there. Weathers walked through the residence, detected an ether-like odor, saw trays of chemicals and noticed items used in the manufacture of PCP in the kitchen. Though he stated that he and Wells felt a dangerous situation existed as long as the chemicals remained at the scene, he also testified that he did not feel there was an emergency necessitating immediate removal of the chemicals from the house at that time. He claimed that he did not remove any chemicals when he was there that first time because "it was early in the morning, the temperature was cool, there was no wind and because we felt that permission to enter and search would build a stronger case, as opposed to just searching without talking to anyone."

After staying at the house about 20 minutes to a half hour, Wells and Weathers then exited the location and drove to the Altadena Sheriff's station where they unsuccessfully sought the suspects' consent to search.[1]

About a half hour later the deputies returned to West Calaveras street and entered the premises. Weathers testified that, in his opinion a dangerous situation still existed in that "the day was about to start. It was now 6:00 or 6:30 in the morning. The temperature was rising. People would be leaving their homes, children to go to school, people to go to work. This aroma was still quite strong and noxious. All those chemicals that I felt would be there, such as sodium cyanide, ether, highly volatile, explosive, intoxicant chemicals. If they should become mixed together somehow even without an explosion the danger of cyanide gas being made existed." He estimated that it would have taken five to eight hours to obtain a warrant and that such delay would have caused an unreasonable risk to that home and adjacent homes.

As a result of their warrantless reentry and search, the officers recovered chemicals and PCP paraphernalia from the residence.

---

[1]Weathers asked Blackwell for permission to search his home, which was refused. The deputy then asked Mrs. Blackwell for permission, which she denied giving. In addition to the 5 to 10 minute drive each way, the officers were at the station about 10 to 15 minutes.

Defendants moved to suppress the evidence as the product of an unreasonable search. Although the trial court rejected any claim of consent, it denied the motion on the grounds there was a continuing "emergency" which justified the warrantless reentry and search.

## I. THE REENTRY WAS NOT JUSTIFIED BY EXIGENT CIRCUMSTANCES

The scope of review of an order denying a suppression motion is twofold: While all presumptions favor the factual findings of the trial court if they are supported by substantial evidence, we must exercise our own independent judgment in measuring the facts found by the trier against the constitutional standard of reasonableness. (*People* v. *Leyba, supra,* 29 Cal.3d at pp. 596-597.)

"[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions. (Fn. omitted.)" (*Katz* v. *United States* (1967) 389 U.S. 347, 357 [19 L.Ed.2d 576, 585, 88 S.Ct. 507]; see also *Mincey* v. *Arizona* (1978) 437 U.S. 385, 390 [57 L.Ed.2d 290, 298-299, 98 S.Ct. 2408].) The People argue, and the trial court found, that the entries and search of the premises herein fell within the exception established for exigent circumstances.

In *People* v. *Ramey* (1976) 16 Cal.3d 263, 276 [127 Cal.Rptr. 629, 545 P.2d 1333], our California Supreme Court defined exigent circumstances as "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence." (See also *Cleaver* v. *Superior Court of Alameda County* (1979) 24 Cal.3d 297, 302 [155 Cal.Rptr. 559, 594 P.2d 984].)

Where, as here, the exigent circumstances rest on a claimed imminent threat of danger to life and property, we apply the two-part test we articulated in *People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1063 [192 Cal.Rptr. 897]: "First, the objective test: was the threat so imminent and serious a reasonable policeman would believe that a warrantless, emergency entry was necessary to save lives and property? And, second, the subjective test: was this officer indeed motivated primarily by a desire to save lives and property?"

We are satisfied that exigent circumstances, especially the threatened destruction of evidence, justified the initial warrantless entry of the residence and defendants do not claim to the contrary. The issue herein

presented, however, is the propriety of the warrantless reentry after the officers had voluntarily left the premises. Defendants claim, and we agree, that the initial emergency had dissipated and there were no sufficient exigent circumstances to justify the second warrantless entry and seizure.

## A. A REASONABLE OFFICER WOULD NOT HAVE BELIEVED THE THREATENED HARM WAS SUFFICIENTLY IMMINENT TO REQUIRE A WARRANTLESS REENTRY

The police did not have valid reasons to believe an immediate reentry was necessary to preserve lives or property upon their return from the station house after their unsuccessful attempt to obtain permission to search.

Warrantless reentries have been upheld in limited situations. However, this was not a situation where the initial entry was terminated because the officers were concerned for their safety (see, e.g., *People* v. *Hamilton* (1980) 105 Cal.App.3d 113 [164 Cal.Rptr. 153]; *People* v. *Superior Court* (*Quinn*) (1978) 83 Cal.App.3d 609 [147 Cal.Rptr. 921]) or the physical condition of the premises prevented the officers from completing their initial inspection and eliminating the source of the danger of fire or the risk of destruction of evidence. (See, e.g. *Michigan* v. *Tyler* (1978) 436 U.S. 499 [56 L.Ed.2d 486, 98 S.Ct. 1942]; *Cleaver* v. *Superior Court, supra,* 24 Cal.3d 297.) Rather, here as in *Mincey* v. *Arizona, supra,* 437 U.S. 385 and *People* v. *Bradley* (1982) 132 Cal.App.3d 737 [183 Cal.Rptr. 434], there was an initial emergency which ceased to exist before the warrantless reentry.

Initially there was a danger that the chemicals would be mixed with water and explode. However, during the initial entries by officers and fire fighters that emergency was treated. At the point the officers reentered to seize the evidence an emergency no longer existed. The undisputed facts show that it was a cool winter day with little wind; the gas line was shut off; the house was ventilated and secured; the hydrocarbon level inside was not dangerous; all persons had been removed from the premises; the narcotics officer and the chemist had determined by inspection that no great urgency existed; and the officers had chosen voluntarily to leave the premises without removing the chemicals that had been observed.

The People's argument that an emergency continued to exist as long as the chemicals remained in the house does not satisfy the imminency requirement. ▇ "[*I*]*mminent* essentially means it is reasonable to anticipate the threatened injury will occur in such a short time that it is not feasible to obtain a search warrant. Thus it is not sufficient a reasonable officer would believe a condition exists inside a dwelling which could *sometime* seriously

injure persons or property. Rather the reasonable officer would have to believe the injury is likely to occur before he could obtain a search warrant." (*People* v. *Dickson, supra,* 144 Cal.App.3d at p. 1065.) ■ Here the officer merely testified that *if* certain chemicals were inside the residence they posed a possibility of explosion and that *if* these chemicals should somehow become mixed together, the danger of cyanide gas being made existed. These conditions could at sometime seriously injure persons or property *if* they materialized. But they do not indicate a likelihood of injury before a warrant could be obtained. Indeed, this same officer's testimony as to his reasons for not bothering to remove the chemicals during his initial entry further substantiates the lack of any imminent danger.

We are not persuaded by the People's argument that it would have taken five to eight hours to obtain a search warrant thus causing hazardous delay. Here, two and a half to three hours elapsed between the first entry and the final search and seizure, and about one hour between the time the chemist and narcotics officer inspected the house and later reentered. Assuming the officers did not have enough time to obtain a conventional search warrant they could have obtained a telephonic search warrant. An officer could have telephoned in the information and obtained permission to search within a shorter period of time than elapsed here.[2] In the type of emergency where officers determine there is not adequate time to seek a conventional search warrant, the telephonic search warrant is an accessible alternative. ■ "The use of such warrants should be encouraged where the alternative would be a warrantless search." (*People* v. *Morrongiello* (1983) 145 Cal.App.3d 1, 12 [193 Cal.Rptr. 105].) ■ Accordingly in the case before this court a reasonable officer would not believe an injury would occur in the "very short time span" (*People* v. *Dickson, supra,* 144 Cal.App.3d at p. 1065) before a telephonic search warrant could be obtained.

## B. THE OFFICERS' CONDUCT WAS INCONSISTENT WITH A PRIMARY MOTIVE TO SAVE LIVES AND PROPERTY

In addition the subjective element of the exigency test was not satisfied. The officers' testimony and their conduct were inconsistent with a primary motive to save lives and property.

---

[2]Because of the procedural distinctions between a conventional search warrant and an oral search warrant, the oral search warrant generally takes less time. Inter alia, the officers do not have to appear before a magistrate and clerical work may be postponed until the warrant has been issued. (See Beechen, *Oral Search Warrants: A New Standard of Warrant Availability* (1973) 21 UCLA L.Rev. 691, 700.) In 1973, only 3 years after the amendment allowing telephonic search warrants, the San Diego District Attorney's office estimated that 95 percent of telephonic warrants take less than 45 minutes.

It is apparent from their conduct that they did not fear an imminent explosion and were not concerned about a continuing emergency. Not only did they fail to evacuate the neighborhood, but they let the chemicals remain in the house, instead of removing them, while they chose to leave the area and drive to the station to attempt to obtain the arrestees' consent to search.

Moreover, the officer expressly testified that the reason for their actions was that they "felt that permission to enter and search would build a stronger case." Thus their admitted motive for reentry and search was to seize evidence, not save lives or property.

## II. THE EVIDENCE MUST BE SUPPRESSED

Once an emergency ceases a defendant regains his right to privacy, and any contraband seized on a second warrantless reentry will be suppressed. (*People* v. *Bradley, supra,* 132 Cal.App.3d at p. 744.) In *Bradley,* as here, the officers chose not to seize the contraband they observed during the original emergency entry, but instead returned later and seized it.

The *Bradley* court pointed out, "[a]ssuming the original entry was justified, the contraband in plain view properly could have been seized." (*Id.,* at p. 746.) But, once the officers who made the initial entry left the interior of the residence without removing any items suspected to be related to criminal activity, "they were in the same position as though they were possessed of reliable information showing [the] home contained illegal drugs, and they were subject to the same rules of conduct. They were bound to present these facts to a magistrate and obtain a warrant, to obtain consent to enter or reenter because of exigent circumstances." (*Id.,* at p. 744.) Here, as in *Bradley,* none of these alternative requirements were met. "Given there was no longer an exigency to justify an entry, the reentry of the [officers] violated [defendants'] constitutional rights." (*Id.,* at p. 746.) Accordingly defendants' motion to suppress the evidence seized pursuant to the reentry search should have been granted.

The judgments are reversed and the cause remanded for further proceedings consistent with the views expressed herein.

Schauer, P. J., and Johnson, J., concurred.

[Civ. No. 22513. Third Dist. Sept. 30, 1983.]

THE PEOPLE ex rel. RICHARD E. ROMINGER, as Director, etc.,
Plaintiff and Respondent, v.
COUNTY OF TRINITY et al., Defendants and Respondents;
SIERRA CLUB, INC., et al., Interveners and Appellants.

COUNSEL

Stark, Stewart, Wells & Robinson, Douglas L. Honnold and Francia M. Welker for Interveners and Appellants.

John K. Van de Kamp, Attorney General, R. H. Connett, Assistant Attorney General, and Kathleen E. Gnekow, Deputy Attorney General, for Plaintiff and Respondent.

No appearance for Defendants and Respondents.

## OPINION

**CARR, J.**—Sierra Club, Inc., and Northwest Forest Workers Association (hereafter referred to individually by name or collectively as interveners) appeal from an order sustaining without leave to amend plaintiff State of California's (State) demurrer to interveners' complaint in intervention. ■ Generally, an order denying intervention is appealable. (6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 43, p. 4057.) In this action interveners' ex parte motion for intervention was granted by the trial court. State successfully demurred to the complaint in intervention, and an order sustaining the demurrer without leave to amend was entered. ■ As we have stated on occasions too numerous to recount, "An order sustaining a demurrer, whether with or without leave to amend, is not appealable." (*Timberidge Enterprises, Inc.* v. *City of Santa Rosa* (1978) 86 Cal.App.3d 873, 878 [150 Cal.Rptr. 606].) Our teachings have apparently gone unheeded and appellants continue to appeal from the order sustaining the demurrer without leave to amend and omit the important procedural step of entering a judgment of dismissal from which an appeal is appropriately taken. No judgment of dismissal was entered herein. But as we also state, with somewhat monotonous regularity, in the interests of judicial economy and to prevent further delay we treat the superior court's order sustaining the demurrer without leave to amend as the equivalent of a judgment of dismissal and interveners' appeal from that order as an appeal from a judgment of dismissal. (See *id.* at pp. 878-879.)[1]

---

[1]With considerable judicial agility, we have managed to salvage an appealable order from the tangled web of procedural sins of omissions and commissions contained in this record. The scenario commences with a complaint by State against the County of Trinity (County). An answer was filed by County to this complaint. Thereafter, by ex parte order interveners filed their complaint in intervention. State then demurred to the complaint in intervention on the primary ground of lack of standing. Interveners countered with a motion to amend the complaint in intervention. On October 25, 1982, the demurrer and motion for leave to amend were argued and submitted.

Inexplicably, on November 2, 1982, a minute order issued denying *motion for leave to intervene.* On December 1, 1982, interveners filed a motion to vacate the order denying motion to intervene on the basis no such motion was before the court and to reconsider and rule on the motion to amend and the demurrer. State joined in this motion, which was heard and submitted on December 13, 1982. On the same date a minute order issued which (1) sustained State's demurrer without leave to amend; and (2) denied the motion to file an

State's complaint was for declaratory and injunctive relief against County. It alleged that certain County ordinances controlling the use of phenoxy herbicides and pesticides[2] were preempted by the California Food and Agricultural Code and the California Administrative Code sections promulgated pursuant thereto. County answered the complaint, asserting the County ordinances in question were valid.

On July 29, 1982, by an ex parte court order, interveners filed their complaint in intervention. Paragraph I of the complaint identified the Sierra Club, alleged its interests in protecting the environment and in supporting the ordinances, and further alleged its members would be harmed if spraying of phenoxy herbicides resumed in Trinity County. The National Forest Workers Association was not identified in the body of the complaint.

State demurrered to the intervention complaint, asserting it failed to state a cause of action in that interveners' lacked standing to appear in the action. State charged interveners' interest in the litigation was remote and consequential and that interveners would neither gain nor lose by direct effect of the judgment.

In their motion for reconsideration filed after the November 2, 1982, order ruling on a nonexistent motion, interveners argued State was collaterally estopped from denying interveners' interest in the litigation as both the Sierra Club and the Northwest Forest Workers Association had, without objection, intervened in an action brought by State in Mendocino County concerning the validity of a Mendocino County ordinance which prohibited aerial spraying of phenoxy herbicides.[3]

In its order sustaining the demurrer, the trial court referred to the November 2, 1982, order as explanation for its ruling. The November order stated in part:

---

amended complaint in intervention. No order was made vacating the improvident order of November 2, 1982, denying leave to intervene and no judgment of dismissal was entered on the demurrer ruling. The appeal was taken from both orders (Nov. 2, 1982 and Dec. 13, 1982). Though the order denying leave to intervene dangles slowly in the record and is an appealable order, to convene an appeal in this matter we treat the denial of leave to amend the complaint in intervention as inferentially vacating that order.