[No. B002314. Second Dist., Div. Three. Mar. 20, 1985.]

THE PEOPLE, Plaintiff and Respondent, v.
RICHARD JAMES MESSINA, Defendant and Appellant.

**COUNSEL**

Donald W. Beacham for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Norman H. Sokolow and Robert F. Katz, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**TURNER, J.**\*—

## I

### PROCEDURAL HISTORY

In an information filed on April 13, 1983, appellant Richard James Messina was charged in count I with manufacturing methamphetamine in violation of Health and Safety Code section 11379. In count II, Messina was charged with possession of both methylamine and phenyl-2-propanone with intent to manufacture methamphetamine in violation of Health and Safety Code section 11383, subdivision (a). In count III, Messina was charged with possession of phenyl of methamphetamine in violation of Health and Safety Code section 11378. In a subsequently filed amendment to the information Messina was alleged to have been convicted of a felony within the meaning

---

\*Assigned by the Chairperson of the Judicial Council.

of Penal Code section 1203, subdivision (e)(4). After the denial of his motion to dismiss pursuant to Penal Code section 995, Messina entered a plea of guilty to the charge contained in count I of the information, a violation of Health and Safety Code section 11379. Messina was sentenced to state prison for a term of three years with appropriate presentence credits and filed a timely notice of appeal.

## II

### THE FACTS

■ ■■■■ The sole witness to testify at the preliminary hearing[1] was Officer Roy Wunderlich of the Los Angeles Police Department. Officer Wunderlich testified that he had been a Los Angeles police officer for twelve and one-half years on January 7, 1983, and had worked as a narcotics investigator for the preceding nine years. He had special training in the field of narcotics investigation, having undergone 90 hours of classroom instruction as well as having conducted extensive reading on the subject. He had interviewed chemists from three different states and had trained a number of other officers. He had interviewed over 1,000 individuals involved in the illicit manufacture of drugs and had testified in and out of California as an expert witness. He had been specifically trained in the area of clandestine laboratories and in the methods of arrest and prosecution of those persons who manufacture dangerous drugs.

On January 7, 1983, Officer Wunderlich received information that a person known as "Richard the Wop" was involved in the manufacture of methamphetamine at his address at 11219 Emelita in North Hollywood. At 4 p.m., on January 7, 1983, Officer Wunderlich went to the aforementioned address which was located in a residential neighborhood. Officer Wunderlich testified that there was a faint smell of methamphetamine but he could not tell from which residence it was emitting. He then returned to the Van Nuys station and using Department of Motor Vehicle records determined that Messina owned a Volkswagon which was located in the driveway of the Emelita residence which had been mentioned by the informant. Officer Wunderlich asked a Detective Sheehan whether he knew who "Richard the Wop" was and Detective Sheehan said that in the last 10 days an informant had stated that Messina was involved in the manufacture of methampheta-

---

[1]At the preliminary hearing, the motion to suppress evidence pursuant to Penal Code section 1538.5, subdivision (f), was denied. In superior court, the correctness of the magistrate's ruling on the suppression of evidence motion was litigated in a motion to dismiss pursuant to Penal Code section 995. The order denying the motion to dismiss when the issue relates to the validity of the search and seizure is appealable. (*People* v. *Lilienthal* (1978) 22 Cal.3d 891, 897 [150 Cal.Rptr. 910, 587 P.2d 706].)

mine. Additionally, Officer Wunderlich obtained a photograph as well as a physical description of Messina.

At 7 p.m., Officer Wunderlich returned to the Emelita Street residence with two other officers. On this occasion, the smell was "very strong" and Officer Wunderlich recognized it as the smell of phenyl-2-propanone which is the primary agent used in the manufacture of methamphetamine. Officer Wunderlich walked around the neighborhood and the closer he got to Messina's residence, the stronger the smell became. Based upon what he had observed, Officer Wunderlich formed the following opinion: "It was my belief there was a clandestine lab in operation and there was an immediate danger." His opinion was based upon his training and experience that such clandestine laboratories were not operated in the best of conditions and had in fact exploded in the past. Between January 1, 1980, and January 7, 1983, Officer Wunderlich was involved in the investigation of three cases where fires had resulted from the operation of a methamphetamine laboratory. One of the fires had occurred two months prior to Messina's arrest in the present case.

Based upon his observations and his opinion, Officer Wunderlich immediately returned to the North Hollywood police station, notified the fire department and requested their assistance. Officer Wunderlich then, along with other officers, developed a plan of entry into the residence. He did not have a search warrant nor did he have permission to enter and search. He desired to enter and search the residence on Emelita because he felt "there was an immediate danger there" and it was his experience that laboratories such as the one he expected to find in Messina's residence "have caught on fire and resulted in fires and explosions . . ." which have resulted in "death and injury." Officer Wunderlich testified that he had been in approximately 20 clandestine laboratories and there had been a danger of chemical fire or explosion in every laboratory. The fire trucks went to the North Hollywood station which was several blocks from Messina's residence and awaited further instructions. One of the firefighters was given a police radio.

Several officers then returned to Messina's residence. The front door was open and Officer Wunderlich stated in a loud voice on three occasions, "Police officer." Furthermore, Officer Wunderlich knocked on the door-jamb. When he received no response he "entered the porch area, knocked again, stated 'police officer, narcotics investigation.'" There was still no response and a boot was thrown into the residence to see if the officers "could stir anybody." When there was no response again, the officer entered the residence and found Messina present. As soon as the residence was secure, the firefighters were directed to go to the residence. Inside the residence, a methamphetamine laboratory was found.

APPELLANT'S CONTENTIONS

Appellant presents two contentions. First, he contends that the evidence which was seized inside the Emelita Street residence was the product of unlawful search and seizure. Second, Messina contends that he was denied his right to cross-examine Officer Wunderlich at the preliminary hearing on issues related to the motion to suppress evidence pursuant to Penal Code section 1538.5, subdivision (f).

III

DISCUSSION

A.

EXIGENT CIRCUMSTANCES JUSTIFIED THE WARRANTLESS ENTRY INTO AND SEIZURE IN THE RESIDENCE

The motion to suppress evidence pursuant to Penal Code section 1538.5, subdivision (f), was properly denied in the municipal court because the magistrate reasonably could have found that there were exigent circumstances to excuse compliance with the warrant requirement. ■ In *People* v. *Hill* (1974) 12 Cal.3d 731, 754 [117 Cal.Rptr. 393, 528 P.2d 1], the Supreme Court held: "A warrantless entry of a dwelling is constitutionally permissible where the officers' conduct is prompted by the motive of preserving life and reasonably appears to be necessary for that purpose. [Citations.] And in determining whether an officer acted reasonably we must consider only reasonable inferences which he is entitled to draw from the facts in the light of his experience." Exigent circumstances have been extended to include a search for persons who might be hiding in a residence. (*People* v. *Block* (1971) 6 Cal.3d 239, 244 [103 Cal.Rptr. 281, 499 P.2d 961].)

■ Of course, the danger of explosion is certainly a proper justification to enter without a warrant and disassemble a potentially dangerous instrumentality in a residential neighborhood. In *People* v. *Scheib* (1979) 98 Cal.App.3d 820, 828 [159 Cal.Rptr. 665], the Court of Appeal held: "In the case at bench the presence of explosives and dangerous weapons in an area used by many people, including children, who might be unaware of the presence of such material, constituted a dangerous condition, comparable to a fire, that required immediate neutralization by the public authorities. [¶] The entry of the deputies onto the land in order to render it safe was as justified as the entry of firemen into a burning building. The continued presence of the deputies on the land was justified in order to reasonably

insure that all dangerous material had been discovered and removed." This court in *People* v. *Patterson* (1979) 94 Cal.App.3d 456, 462-464 [156 Cal.Rptr. 518], held that exigent circumstances existed for a warrantless arrest in a residence because of an existence of a PCP lab. In *Patterson,* the officer who conducted the search without a warrant gave as the reason for not attempting to secure a warrant the following justification: " 'Due to the circumstances I felt that it was my duty to act promptly as I am well aware of the volatile nature of the chemical [*sic*] used in the manufacture of phencyclidine and felt that I had to act immediately due to the danger of explosives.' " (*People* v. *Patterson, supra,* 94 Cal.App.3d 463.) This court concluded that given the officer's past experience and expertise that it was entirely reasonable to conclude that there were sufficient dangers present to constitute exigent circumstances. Accordingly, we follow *Patterson.* Because of Officer Wunderlich's expertise and training it was entirely reasonable for him to conclude that there was a serious threat to public safety and there was no requirement that he obtain a warrant before acting to protect the public in a residential neighborhood in which there was a methamphetamine laboratory being operated.

Furthermore, it is abundantly clear that the types of chemicals used to manufacture methamphetamines are extremely hazardous to health. The Drug Enforcement Administration's Clandestine Laboratory Guide indicates at pages 110-115 that the common chemicals used to synthesize methamphetamine include methylamine, mecuric chloride, and in some circumstances, metallic sodium, hydrochloric acid, and hydrogen. These chemicals can be highly dangerous and their presence in a residential neighborhood is absolutely beyond the pale of suggestion that they are safe. The National Fire Protection Association (NFPA) has published standards to help firefighters and others gauge the danger levels of various chemicals. Under the National Fire Protection Association Hazard Identification System, the severity of danger posed by a given chemical is rated on a numerical scale with 4 being the most dangerous and 0 being the least dangerous. The NFPA has published standards in the categories of health, flammability, and reactivity.

The NFPA gives the methamphetamine family of chemicals a health hazard rating of 3 and a flammability hazard rating of 4. Sodium is given a health hazard rating of 3 and a reactivity rating of 2. The health and flammability ratings of hydrogen are 3 and 4 respectively while hydrochloric acid (hydrogen chloride) is given a health hazard rating of 3.

The NFPA ratings demonstrate the dangerousness of the chemicals used in manufacturing methamphetamine. For example, a numerical health rating of 3 is given for the methamphetamine family including sodium and hydro-

gen. The NFPA rating of 3 for a health hazard is defined as follows: "Materials extremely hazardous to health, but areas may be entered with extreme care. Full protective clothing, including self-contained breathing apparatus, rubber gloves, boots and bands around legs, arms and waist should be provided. No skin surface should be exposed." With respect to the flammability factor of 4 which applies to the methylamine family of chemicals and hydrogen, the NFPA states the following should be the conduct of firefighters within the presence of such chemicals: "Very flammable gases, very volatile flammable liquids, and materials that in the form of dusts or mists readily form explosive mixtures when dispersed in air. Shut off flow of gas or liquid and keep cooling water streams on exposed tanks or containers. Use water spray carefully in the vicinity of dusts so as not to create dust clouds." Pertinent to its assessment of metallic sodium which has a reactivity hazard rating of 2, the NFPA notes: "Materials which in themselves are normally unstable and readily undergo violent chemical change but do not detonate. Includes materials which can undergo chemical change with rapid release of energy at normal temperatures and pressures or which can undergo violent chemical change at elevated temperatures and pressures. Also includes those materials which may react violently with water or which may form potentially explosive mixtures with water. In advanced or massive fires, fire fighting should be done from a protected location." All of the foregoing is taken from the NFPA publication of Fire Protection Guide on Hazardous Materials (6th ed. 1975) 49-21–49-23, 49-169, 49-197, 49-261.

Our review of other authorities lead us to conclude that the chemicals normally used in the manufacture of methamphetamine are quite dangerous. The Condensed Chemical Dictionary (8th ed.) at page 564, states in connection with methylamine, "Flammable, dangerous fire risk." The same dictionary defines mercuric chloride as being highly toxic by ingestion, inhalation and skin absorption and contains the warning, "May be fatal." The Condensed Chemical Dictionary, *supra,* at page 552. Another publication entitled The Merck Index: An Encyclopedia of Chemicals and Drugs (9th ed. 1976) at page 786, describes methylamine as a flammable gas at ordinary temperature and pressure and further defines mercuric chloride as highly toxic. The Merck Index: An Encyclopedia of Chemicals and Drugs, *supra,* at page 764. The United States Department of Transportation, 1980 Emergency Response Guide Book Hazardous Materials offers a similar warning for methylamine and mercuric chloride. Beyond a shadow of doubt, the presence of these chemicals in an unprofessional laboratory in a residential area constitutes an emergency which requires immediate and proper response by law enforcement.[2]

---

[2]The case at bar is distinguishable from two cases decided by Division Seven of this appellate district (*People* v. *Dickson* (1983) 144 Cal.App.3d 1046, 1073 [192 Cal.Rptr. 897]

Thus, we conclude that the warrantless entry into the premises was justified by the existence of exigent circumstances. The drugs in question presented a clear threat to public safety and the expeditious response of the police and fire departments to that threat does not violate the warrant requirement. Accordingly, the magistrate correctly denied the motion to suppress evidence pursuant to Penal Code section 1538.5, subdivision (f), and the superior court judge correctly denied the motion to dismiss pursuant to Penal Code section 995.

B.

THE MOTION TO DISMISS BASED UPON THE ALLEGED DENIAL OF THE RIGHT TO CROSS-EXAMINE OFFICER WUNDERLICH WAS PROPERLY DENIED

Messina contends that the motion to dismiss pursuant to section 995 should have been granted because the magistrate denied Messina's attorney the right to voir dire Officer Wunderlich with respect to his good faith that a true emergency situation existed. During the direct examination of Officer Wunderlich, defense counsel requested permission to engage in voir dire questioning. During the questioning of Officer Wunderlich, the following was asked: "You knew, did you not, that if you did not have a search warrant, you would have to have a reason to go into the premises?" The

---

and *People* v. *Blackwell* (1983) 147 Cal.App.3d 646, 654 [195 Cal.Rptr. 298]) in which warrantless seizures of illegal drug laboratories were held to be invalid. In the present case, the officer was a highly trained investigator while none of the peace officers in *Dickson* and *Blackwell* who made the initial entries into the residences had Detective Wunderlich's expertise (*People* v. *Dickson, supra,* 144 Cal.App.3d 1050-1051, 1053-1054; *People* v. *Blackwell, supra,* 147 Cal.App.3d 649-650) in the field of clandestine drug laboratories. In the case at bar, two informants had identified Messina as manufacturing methamphetamine, allegations corroborated by the smell of phenyl-2-propanone, while no significant information existed in *Dickson* apart from the smell of ether and the observation of some bottles in the home (*People* v. *Dickson, supra,* 144 Cal.App.3d 1053-1059). In both *Dickson* and *Blackwell,* the Court of Appeal concluded that the officers and deputies were not really concerned about the danger of explosion. (*People* v. *Dickson, supra,* 144 Cal.App.3d 1065-1070; *People* v. *Blackwell, supra,* 147 Cal.App.3d 652-654.) By contrast, in this case, once Officer Wunderlich finally identified the residence from which the smell of phenyl-2-propanone was emanating, he promptly returned to a nearby police station, notified the fire department, and quickly developed a plan to safely disassemble the laboratory. Within 30 minutes after Officer Wunderlich had identified the house where the laboratory was located, the police and the fire department were inside Messina's residence. Officer Wunderlich sincerely believed he was confronted with an emergency and his conduct was consistent with that belief.

Furthermore, in *Blackwell,* the court held that a warrantless reentry two and one-half to three hours after an emergency situation (an operating PCP laboratory in a residential neighborhood) had been abated would not be justified on an exigent circumstances theory (*People* v. *Blackwell, supra,* 147 Cal.App.3d 653-654). In this case, there is no issue of a reentry. Finally, in neither *Dickson* nor *Blackwell* did the court have before it the compelling scientific data set forth in this opinion concerning the dangers of a clandestine methamphetamine laboratory.

court sustained the prosecutor's objection that this subject could be pursued on cross-examination rather than voir dire. Later, during cross-examination, defense counsel attempted to ask Officer Wunderlich whether it was his own belief that the only way that he could "go in there without a search warrant was an emergency situation?" An objection was interposed and the court decided to allow defense counsel to reask the question. The following question was then asked, "Did you have a belief that in order to go into that residence without obtaining a search warrant, that you had to have an emergency situation?" The prosecution then interposed objections based upon the fact that the question was purportedly confusing, compound, did not seek the answer that defense counsel stated he wanted to seek and called for opinion as to the law. After the court sustained the objection defense counsel stated: "I think I have the right to ask that. If the court sustains the objection, I don't intend to rephrase it."

The court responded: "The ruling stands on the form of the question he asked. If you choose not to ask any other questions, it's up to you." No further questions were asked.

We believe that this issue may not properly be raised on appeal. ■ In *People* v. *Pompa-Ortiz* (1980) 27 Cal.3d 519, 529 [165 Cal.Rptr. 851, 612 P.2d 941], the Supreme Court limited the power to reverse judgments on direct appeal when the issue involved irregularities at a preliminary hearing when the court noted: "Henceforth irregularities in the preliminary examination procedures which are not jurisdictional in the fundamental sense shall be reviewed under the appropriate standard of prejudicial error and shall require reversal only if defendant can show that he was deprived of a fair trial or otherwise suffered prejudice as a result of the error at the preliminary examination. The right to relief without any showing of prejudice will be limited to pretrial challenges of irregularities." ■ Since the issue relating to cross-examination is not one of search and seizure within the meaning of Penal Code section 1538.5, we believe that *Pompa-Ortiz* applies and the burden rests with Messina to show prejudice. No showing has been made as to any prejudice nor has there been any evidence that the plea which was entered in this case was improper. Accordingly, because the issue concerning cross-examination does not involve "validity of a search or seizure . . ." (*People* v. *Lilienthal, supra,* 22 Cal.3d at p. 897), the failure to demonstrate prejudice requires that the judgment be affirmed.

However, even if the issue properly can be raised, we believe that the failure of defense counsel at the preliminary hearing to even attempt to ask a similar question designed to determine the officer's state of mind concerning the existence of an emergency bars raising the issue. The magistrate made it clear that further questions could be asked and defense counsel

refused to even attempt to elicit any further testimony concerning the officer's state of mind. Therefore, Messina has waived his right to argue that he was denied the right to cross-examine when the magistrate clearly indicated that further questioning would be in order so long as it did not call for inadmissible matters such as the legal conclusion of the officer. Accordingly, if the issue of whether there was an unlawful limitation on the right to cross-examine may be raised at all, we are of the opinion that the magistrate did not prohibit further cross-examination on the officer's state of mind and that the trial court correctly denied the motion to dismiss pursuant to Penal Code section 995.

## IV

### DISPOSITION

The judgment is affirmed.

Danielson, Acting P. J., and Arabian, J., concurred.