[No. B007491. Second Dist., Div. Seven. Nov. 21, 1985.]

THE PEOPLE, Plaintiff and Appellant, v.
GERALD STEPHEN ABES et al., Defendants and Respondents.

## COUNSEL

Ira Reiner, District Attorney, Donald J. Kaplan and Arnold T. Guminski, Deputy District Attorneys, for Plaintiff and Appellant.

Wilbur F. Littlefield, Public Defender, Laurence M. Sarnoff, James H. Barnes, Ronald B. Davey, Deputy Public Defenders, and Mari S. Morsell for Defendants and Respondents.

## OPINION

**LILLIE, P. J.**—The People appeal from order granting motion to set aside count I of the information (possession for sale of PCP); count II (under the influence of PCP) was transferred to the municipal court for further proceedings.

## I

### FACTS

About 2:30 p.m. Sergeant McCormick received a radio call to investigate possible PCP at an apartment building on Cleon Avenue; when he arrived he smelled a very strong odor of ether; the manager told him she had detected a heavy odor of ether about the premises and it was emitting from apartment 53, then took the officers up one flight to apartment 53 (in which defendants Abes and Luna resided) which opened onto a stairwell. The odor of ether was very strong, "extremely heavy" outside of and coming from apartment 53; Sergeant McCormick associated this odor with the manufacture of PCP and knew that ether was an extremely flammable and explosive

chemical; he then directed an officer to the rear of the building and ordered a fire department unit and additional police units.

When additional police units arrived, the officers began evacuation of the apartment building because ether is "extremely flammable and explosive." The officers knocked on doors on the upper and lower levels alerting the occupants; Sergeant McCormick aroused five persons all of whom were directed to the front of the building. They had been knocking on doors for about five minutes when Sergeant McCormick, standing on the sidewalk at the bottom of the stairwell, looked up and saw defendant Abes exit apartment 53 and start down the stairs; he noted that Abes' "actions were very strange. That he appeared to have difficulty in locating the ground with his feet. . . . He was, his actions were uncoordinated." Sergeant McCormick identified himself and directed Abes to continue down the stairwell; Abes did not respond but stopped, looked at him and appeared not to understand what he was saying; he again directed Abes to proceed down the stairwell, a tier of 20-25 steps, whereupon Abes continued one step at a time, "very cautiously," down the stairwell; Sergeant McCormick believed that Abes was under the influence of PCP[1]; fellow officers took him into custody.

At that time Sergeant McCormick looked up 15 to 20 feet above him, and saw defendant Luna also step out of the doorway of apartment 53 onto the landing; he watched her take four or five steps to the rail, and noted "that she appeared to be very uncoordinated and that her gait, she was also having difficulty finding the ground with her feet"; he called out to her, "Police officers. Come down the stairs," but she stood there and did not appear to comprehend what he was saying; he made several requests of her to come down the stairs, then again identified himself and started to walk up the stairwell towards her; Luna "looked in our direction and quickly went back into the apartment [53] and closed the door." At that time Sergeant McCormick was of the opinion that Luna was under the influence of PCP.

---

[1]Officer McCormick is a Los Angeles police sergeant assigned to a field services division, and a veteran on the force of 18 years and 8 months; he had not previously qualified as an expert on PCP; he had received training from narcotic experts in the field of PCP for the detection of the odor that is emitted during the processing of PCP, in roll call training detectives from the bomb squad spoke on the potential danger of PCP laboratories, he attended lectures on the effects of PCP on people, he has observed slides depicting PCP laboratories exploding, there have been labs that have exploded in his district, he has made about 30 arrests of persons for being under the influence of PCP, for two months in 1981 he was on loan to the narcotics division, and the information he had received from Officer Stanley and S.I.D. personnel was that labs used for the manufacture of PCP do not follow the normal precautions followed in a regular lab; the predominant odor associated with PCP is ether which is "a highly flammable, explosive-type chemical"; the symptoms of being under the influence of PCP are loss of equilibrium, thick and slurred speach, difficulty in putting thoughts together, difficulty in remembering, vertical and horizontal nystagmus, inability to judge height when walking and one "cannot judge where the sidewalk is."

Sergeant McCormick, Officer Jefferson and another officer continued up the stairs to the door of apartment 53 and knocked; Sergeant McCormick identified himself as a police officer and demanded entrance; there was no verbal response from inside but he could hear movement within the apartment; again he demanded admittance and, after waiting 15 seconds and no response, forced entry; he "believed that evidence could be, was being destroyed by the defendant Luna"; further, "At that time I had reason to believe that there was a laboratory at the location and felt that the evidence could be destroyed, if I did not force entry into the apartment"; "The defendant, in my estimation was under the influence of PCP and at that time she was in the process of escaping from me."

They entered the apartment and saw Luna carrying a brown paper shopping bag walking towards the rear of the apartment; Officer Jefferson removed the bag from her; Luna and one Brookner were handcuffed; Sergeant McCormick immediately took Luna out of the apartment and downstairs, the other officer took out Brookner, because "At that time the heavy odor of ether in the apartment was very, very extremely strong and I was concerned about their safety and my safety"; Officer Jefferson removed from the shopping bag a round pint size metal container from which emitted the heavy odor of ether, and two small boxes containing herb tea; he left the apartment placing the can on top of the ice chest out on the stairwell for ventilation; it was later transported by S.I.D. in a special vehicle. When analyzed, it was found to contain 486 milliliters of diethyl ether, enough when detonated to fire bomb an area about the size of a tennis court.[2]

When Sergeant McCormick took Luna downstairs, "[a]t that time" the fire department unit arrived and "a few minutes later" he reentered the apartment with fire department personnel; they found various items, some in plain sight, others in a cupboard and freezer—a plate containing a green leafy substance, cans and jars of liquid, film canisters of a green leafy substance, roaches, two hand scales and a beaker. Officer Stanley, an expert in the possession, sale and manufacture of PCP went to the Cleon Street address; when he turned into Cleon, 100 to 150 feet from the apartment building, he detected a strong ether odor; when he came to the stairwell of apartment 53 where the ether can was located, he smelled a very, very strong odor of ether; the officers and fire department personnel were inside and outside of the apartment. He expressed the opinion that 24 grams of green leafy substance contaminated with phencyclidine found on the premises were possessed for sale. The various cans, canisters, plate, liquid con-

---

[2]At the preliminary hearing the can was marked as an exhibit by reference, the magistrate noting, "because of the dangerous nature of ether, there is a court order issued by the presiding judge of the Superior Court that P.C.P. and its component parts are not permissible in courtrooms."

tainers and roaches found on the premises contained "phenylcyclottexye-pyrrolidine."

## II

### MAGISTRATE'S HOLDING

The magistrate ruled the entry and search of and seizure at apartment 53 to be lawful. When Luna moved to strike Sergeant McCormick's testimony—that in his opinion she was under the influence of PCP—on the ground he is not qualified as an expert to form that opinion, the magistrate related Sergeant McCormick's length of service, experience, training and knowledge of PCP and its effects, and said, "I think that we have to look to whether a reasonable person under the circumstances given his training and experience, could have formed the opinion that she was under the influence of PCP. [¶] And based on this test, I would say that he could form that opinion." Later the magistrate found that Sergeant McCormick not only detected the strong odor of ether, but personally observed, even though briefly, both defendants under the influence of something he had been taught was PCP; that even though there are legal uses for ether, Sergeant McCormick "saw something inconsistent with the legal use of that component," "what [McCormick] did see was consistent with what he had learned about someone being under the influence of PCP," he then told Luna to stop, and she fled and, putting these factors together, there was probable cause to arrest her at that point; that "the fact that she went into the house, she can't escape or get around the requirements of *Ramey* [*People* v. *Ramey* (1976) 16 Cal.3d 263 (127 Cal.Rptr. 629, 545 P.2d 1333)] by herself going in the house and slamming the door, specifically when you do have a substance like ether around, there was a very strong smell of it"; and distinguishing the case from *People* v. *Dickson* (1983) 144 Cal.App.3d 1046 [192 Cal.Rptr. 897], that "the police officers, did act properly in this case."

## III

### MOTION TO SET ASIDE INFORMATION

On the motion under section 995, defendants argued, as they do here, that (1) there was no probable cause to arrest them and (2) the entry to the apartment was illegal. The superior court found "that the arrest was not legal and the results of the arrest were illegal" because there was no emergency justifying entry, and granted the motion as to count I (possession for sale of PCP). The motion was denied as to count II (under the influence of PCP) and the court transferred the same to the municipal court as to both defendants.

IV

SCOPE OF REVIEW

"[I]n proceedings under section 995 it is the magistrate who is the finder of fact; the superior court has none of the foregoing powers [judge credibility, resolve conflicts, weigh evidence and draw inferences], and sits merely as a reviewing court; it must draw every legitimate inference in favor of the information, and cannot substitute its judgment as to the credibility or weight of the evidence for that of the magistrate. [Citation]. On review by appeal or writ, moreover, the appellate court in effect disregards the ruling of the superior court and directly reviews the determination of the magistrate holding the defendant to answer. [Citations.]" *(People* v. *Laiwa* (1983) 34 Cal.3d 711, 718 [195 Cal.Rptr. 503, 669 P.2d 1278].)

V

PROBABLE CAUSE TO DETAIN AND ARREST

Police are entitled to stop and briefly detain a suspect for questioning or other limited investigation on circumstances short of probable cause to make an arrest (*In re Tony C.* (1978) 21 Cal.3d 888, 892 [148 Cal.Rptr. 366, 582 P.2d 957]; *In re Michael V.* (1974) 10 Cal.3d 676, 681 [111 Cal.Rptr. 681, 517 P.2d 1145].) Sergeant McCormick was found by the magistrate to have sufficient training and experience in the field of PCP to identify the manifestations of its use and manufacture, and the record adequately supports such finding. In order to justify an investigative stop or detention, the circumstances known or apparent to the officer must include specific and articulable facts causing him to suspect the person he intends to stop or detain is involved in criminal activity. Not only must he subjectively entertain such a suspicion, but it must be objectively reasonable for him to do so; the facts must be such as would cause any reasonable police officer in a like position, drawing on his training and experience, to suspect the same criminal activity and the same involvement by the person in question. (*People* v. *Leyba* (1981) 29 Cal.3d 591, 597 [174 Cal.Rptr. 867, 629 P.2d 961]; *People* v. *Bower* (1979) 24 Cal.3d 638, 644 [156 Cal.Rptr. 856, 597 P.2d 115]; *In re Tony C., supra,* 21 Cal.3d 888, 893 [148 Cal.Rptr. 366, 582 P.2d 957].) Given the facts known and apparent to Sergeant McCormick at the time he first identified himself and ordered Luna to descend the stairwell, i.e., his personal observations of Abes' condition which resulted in his arrest for being under the influence of PCP, his detection of the extremely heavy odor of ether emitting from the apartment out of which Abes had just exited leading him to entertain a strong suspicion that a PCP laboratory was inside, and his personal observations of Luna, who followed

Abes out of the apartment, and her appearance and conduct just before identifying himself and ordering her to come down the stairs, Sergeant McCormick could, and did have a reasonable suspicion that Luna was then connected with criminal activity sufficient to justify a "detention for reasonable investigative procedures . . . ." (*People* v. *Flores* (1974) 12 Cal.3d 85, 91 [115 Cal.Rptr. 225, 524 P.2d 353].)

■ At that point, Sergeant McCormick had the right to direct her to come down the stairs, and he did so. Luna did not move. At that time within her sight, Abes was being handcuffed by officers at the foot of the stairwell. When, one more time, Sergeant McCormick identified himself, started up the stairs toward her and ordered her to come down, she looked in his direction, turned and fled into apartment 53, closing the door. As to probable cause to arrest Luna, "A suspect does not possess the right to resist a lawful detention." (*People* v. *Superior Court (Bowden)* (1976) 65 Cal.App.3d 511, 523 [135 Cal.Rptr. 306].) Further, flight at the approach of a police officer, especially under these circumstances, may be properly considered as indicative of consciousness of guilt. (*People* v. *Levy* (1971) 16 Cal.App.3d 327, 334 [94 Cal.Rptr. 25].) The foregoing circumstances considered in toto amounted to probable cause to arrest Luna when she opened the door to apartment 53 and entered, closing the door on the officers. (*People* v. *Martin* (1973) 9 Cal.3d 687, 692 [108 Cal.Rptr. 809, 511 P.2d 1161]; *People* v. *Ingle* (1960) 53 Cal.2d 407, 412 [2 Cal.Rptr. 14, 348 P.2d 577].) Sergeant McCormick had reasonable cause to believe a public offense (being under the influence of PCP) was being committed in his presence. (§ 836, subd. 1, Pen. Code.) The circumstances also were such as to lead him to "entertain an honest and strong suspicion" that Luna was involved in the illegal manufacture of PCP. (*People* v. *Ingle, supra,* 53 Cal.2d 407, 412.) Sergeant McCormick testified he had reason to believe there was a laboratory in apartment 53. Unlike *People* v. *Dickson, supra,* 144 Cal.App.3d 1046, in which the court said the smell of ether alone could not supply probable cause for arrest because it has so many legitimate uses its odor is as consistent with lawful as with criminal activity, there is here "further evidence establishing the chemical probably is being used for an illegal purpose, rather than one of its many legitimate functions. [Citation.]" (Pp. 1054-1055.) That evidence, in addition to the very, very strong odor of ether emanating from the door of apartment 53, is the emergence therefrom of Abes who was taken into custody for being under the influence of PCP, followed by Luna who, Sergeant McCormick also had reasonable cause to believe, was under the influence of PCP, and who took flight upon his approach, then Luna's refusal to open the door after the several demands for admittance by Sergeant McCormick whom she knew to be a police officer. Too, in *Dickson,* the court held that although the officer smelled a strong odor of ether, his conduct was inconsistent with a subjective belief

that an explosion was imminent. Here, at the outset Sergeant McCormick voiced his concern for the danger involved, immediately called the fire department and, before fire personnel ever arrived, proceeded to evacuate tenants on the top and lower floors. This action was entirely consistent with Sergeant McCormick's sense of imminent danger. (*People* v. *Messina* (1985) 165 Cal.App.3d 937, 944-945 [212 Cal.Rptr. 75].)

## VI

### ENTRY TO APARTMENT 53

■ *People* v. *Ramey* (1976) 16 Cal.3d 263 [127 Cal.Rptr. 629, 545 P.2d 1333] holds that "warrantless arrests within the home are per se unreasonable in the absence of exigent circumstances. . . . [¶] In this context, 'exigent circumstances' means an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." (P. 276, fn. omitted.)

■ The magistrate held that *Ramey* did not apply. Given the circumstances constituting probable cause for Sergeant McCormick to arrest Luna just as she entered her apartment and closed the door, we agree with the magistrate that Luna cannot frustrate an arrest by fleeing from a public place, on the landing of the stairwell, into her home and invoke the protection of *Ramey*. In *United States* v. *Santana* (1976) 427 U.S. 38 [49 L.Ed.2d 300, 96 S.Ct. 2406], police had probable cause to arrest defendant who was standing in the open doorway of her home, for a narcotic sale; as they approached shouting "police" and displaying their badges, she retreated into the vestibule of her home; police followed through the open door and arrested her. The Supreme Court held the arrest and subsequent search to be valid. It concluded that the threshold of defendant's home was a public place and the officers having probable cause to arrest her there, Santana could not thwart the otherwise proper arrest by retreating into her house, a private place. The court relied on *Warden* v. *Hayden* (1967) 387 U.S. 294 [18 L.Ed.2d 782, 87 S.Ct. 1642], which it characterized as "involving a true 'hot pursuit,'" commented that "'hot pursuit' means some sort of a chase, but it need not be an extended hue and cry 'in and about [the] public streets.' The fact that the pursuit here ended almost as soon as it began did not render it any the less a 'hot pursuit' sufficient to justify the warrantless entry into Santana's house" (pp. 42-43 [49 L.Ed.2d at p. 305]), and concluded "Once Santana saw the police, there was likewise a realistic expectation that any delay would result in destruction of evidence. [Citation.]

Once she had been arrested the search, incident to that arrest, which produced the drugs and money was clearly justified. [Citations.] [¶] We thus conclude that a suspect may not defeat an arrest which has been set in motion in a public place, and is therefore proper . . ., by the expedient of escaping to a private place." (P. 43 [49 L.Ed.2d at pp. 305-306].)

It is the very presence of exigent circumstances—the "hot pursuit"— brought about by Luna's flight that caused Sergeant McCormick to follow her. Thus, *Ramey* is of no assistance to her. (See also *People* v. *Sanchez* (1978) 86 Cal.App.3d Supp. 12 [150 Cal.Rptr. 772].) The landing on the stairwell was a public place where tenants, delivery men and others of the public were free to go; Sergeant McCormick had probable cause to arrest her and when he started up the stairs, an arrest was set in motion. Further, as in *Santana,* once Luna knew the police wanted her, there was a realistic expectation on the part of Sergeant McCormick, who had reason to and did believe a PCP laboratory was in apartment 53, that once in the apartment a destruction of evidence was imminent, and he so testified; this is further supported by Luna's refusal to respond to his knock and by movement inside of the apartment. But, if it can be said that Sergeant McCormick had reasonable cause to arrest Luna only for being under the influence of PCP, the fact it was a misdemeanor is of no significance in determining the validity of the entry without a warrant. (*People* v. *Hampton* (1985) 164 Cal.App.3d 27, 33-34 [209 Cal.Rptr. 905].)

VII

REENTRY AND SEARCH

Given the validity of the warrantless entry[3] to apartment 53 to arrest Luna, we conclude the seizure of the can of ether in the brown shopping bag in the possession of Luna contemporaneous with her arrest was also valid. (*Chimel* v. *California* (1969) 395 U.S. 752 [23 L.Ed.2d 685, 89 S.Ct. 2034].)

The People advance the validity of Sergeant McCormick's reentry to the apartment citing the factors of time and purpose. *People* v. *Blackwell* (1983) 147 Cal.App.3d 646 [195 Cal.Rptr. 298], relied on by defendants, is instructive but differs factually from the instant case. Justification for reentry to the premises urged in *Blackwell* was the exigent circumstances resting on a claimed imminent threat of danger to life and property. Apply-

---

[3]The same exigent circumstances justifying the warrantless entry also would have excused noncompliance with the knock and notice requirements of section 844, Penal Code, with which Sergeant McCormick complied, and the forcible entry.

ing the two-prong test articulated in *People* v. *Dickson, supra,* 144 Cal.App.3d 1046, 1063, this court held that while exigent circumstances existed for the initial entry, a reentry three hours later was not justified because (1) a reasonable officer would not have believed the threatened harm was sufficiently imminent to require a search without a warrant, and (2) the officer's conduct was inconsistent with a prime motive to save lives and property. The initial entry was at 3:30 a.m.; the firemen arrived at 3:45 a.m., opened the windows and cut the gas supply, no one (other than arrestees) was alerted or evacuated; at 5 a.m. Deputy Wells arrived and inspected the premises but "did not sense a deep urgency," and left; between 5 and 5:30 a.m. Officer Weathers arrived, the fire personnel were still there and he and Wells felt a danger existed as long as the chemicals were on the premises but felt no urgency to remove them; Wells and Weathers then unsuccessfully sought the arrestees' consent to search; at 6 or 6:30 a.m. they returned to the premises, searched and seized evidence. This court held that the initial emergency justifying the first entry had dissipated and there were no exigent circumstances justifying the second entry three hours later. "Initially there was a danger that the chemicals would be mixed with water and explode. However, during the initial entries by officers and fire fighters that emergency was treated. At the point the officers reentered to seize the evidence an emergency no longer existed. The undisputed facts show that it was a cool winter day with little wind; the gas line was shut off; the house was ventilated and secured; the hydrocarbon level inside was not dangerous; all persons had been removed from the premises; the narcotics officer and the chemist had determined by inspection that no great urgency existed; and the officers had chosen voluntarily to leave the premises without removing the chemicals that had been observed." (P. 652.)

By contrast, in this case, once Sergeant McCormick smelled the very heavy odor of ether, he felt a dangerous situation existed and called for a fire department unit, then immediately started to and did evacuate the tenants without waiting for the fire department to arrive. He sensed an even greater danger when, while evacuating the tenants, he observed the two defendants, both of whom he believed to be under the influence of PCP, leave the apartment from which the heaviest ether odor emitted. He felt more urgency when Luna fled to the apartment; and he believed the flight was not only to escape arrest but to destroy evidence. The officers waited no longer for the fire department, but entered the premises. What then occurred was done with such dispatch for the safety of the occupants and the officers that they had no time to look around to assess the situation, to look for chemicals or a PCP lab, to find or remove any evidence or to treat the emergency, because "the heavy odor of ether in the apartment was very, very extremely strong and [McCormick] was concerned about [defendants'] safety, and his safety." It is clear that they had not "chosen voluntarily to

leave the premises without removing the chemicals"; they left immediately and hustled defendants downstairs for their safety, action totally consistent with their belief danger was imminent. At that time fire department personnel arrived and Sergeant McCormick went back upstairs with them and into the apartment. Only a few minutes elapsed. Actually the initial entry, removal of the arrestees and reentry to the apartment was one continuous police operation. Had they not felt a dangerous condition existed they doubtless would have remained in the apartment and searched for contraband. Much of the contraband was in plain sight, some of it was taken during the inspection to ascertain the presence and identity of chemicals, from cupboard and freezer. The foregoing situation is a far cry from *Blackwell* in which three hours elapsed between entries, the emergency had been treated during the initial entry, no emergency measures had been taken by the officers, the officers themselves determined no great urgency existed, and the officers voluntarily left the premises without taking any of the evidence. (*People* v. *Messina, supra,* 165 Cal.App.3d 937, 944-945, fn. 2.) Indeed, it would be ludicrous to require the officers, after lawfully entering the apartment to arrest Luna and prevent the destruction of evidence, to remain outside of the apartment they had just left to take their arrestees to safety, while fire personnel entered to treat the emergency.

DISPOSITION

The order is reversed.

Thompson, J., and Johnson, J., concurred.